544 A.2d 972

**Richard A. LOWRY, Appellant,**

v.

**Clarissa V. LOWRY, Appellee.**

Superior Court of Pennsylvania.

Submitted Feb. 4, 1988.

Filed June 27, 1988.

---

Lila F. Levy, Milford, for appellant.

Alan Cooper, Hawley, for appellee.

Before BECK, KELLY and JOHNSON, JJ.

BECK, Judge:

This appeal presents numerous challenges by appellant husband, Richard Lowry, to the equitable distribution order of the trial court. Among these is a novel question concerning the valuation of husband's pension, a portion of which was earned during the marriage and is marital property. Also challenged are the trial court's exclusion of a portion of the value of the marital home from marital property, the court's division of the appreciation in value of the marital property during marriage, the court's inclusion of certain proceeds of the sale of securities and of a savings and a checking account in marital property and its division of real estate commissions jointly earned by the parties.

The factual background pertinent to all issues except the pension is as follows.[1] Richard and Clarissa Lowry were married in 1971. This was husband's third and wife's second marriage. At the commencement of their marriage, the parties lived in wife's home in Long Island, New York. They wished, however, to build their own home. To this end, in 1972, they purchased an undeveloped parcel of land in an area called Hemlock Farms in Pike County, Pennsylvania. At the time of the purchase, the property was held in joint names. The funds to purchase the property, about $7,300, as well as certain funds expended to have initial work done on the construction of the home, about $4,000, were obtained through refinancing wife's Long Island home.

In late 1972, husband experienced difficulties with one of his former wives, who allegedly threatened to "take" husband's Hemlock Farms property. In response to these difficulties, husband transferred his interest in the Hemlock Farms property to wife, stating that he would rather she have it than his former wife. From that time forward, title to the Hemlock Farms property was in wife's name alone.

1. The facts relative to the pension, insofar as we can determine them from the sparse record on appeal, are set forth below in connection with our discussion of that issue.

The balance of the construction work on the Hemlock Farms property was done by the parties themselves and funded through the sale in late 1974 of wife's Long Island home. The proceeds of the sale of wife's home, after payment of the mortgage, a commission and an unrelated loan, were about $27,000. Wife deposited this money into her savings account. When the balance in this account had decreased to about $13,000, wife transferred the remaining money into the parties' joint savings account. Wife testified that she used the entire $27,000 to buy the supplies and materials necessary to construct the Hemlock Farms property.

Wife also testified that the home cost $56,000 to build. Husband testified that it cost only about $38,000. The master found that wife contributed from her funds at least $50,000 of the cost of building the home and that the parties shared in the labor expended on the construction. The parties stipulated that the value of the home as of the date of hearing was $86,000. The trial court recites in its Opinion that the parties also stipulated that of this $86,000, $36,000 represented the increase in value of the home due solely to the parties' joint labor in constructing it.[2]

Both parties were employed throughout the marriage. Initially, wife was a secretary earning $140–$240 per week. Husband was a union plumber. He testified that he earned $369 per week. Wife stated that he "brought home" only about $260 per week, of which $90 per week was expended on support payments for his children of a prior marriage. In 1976, both parties left their jobs. Husband operated his own construction firm, and both parties began to work

2. We cannot locate any written or oral stipulation by the parties concerning the increase in value in the record. The master's report states that the increase in value due to the parties' efforts was $20,000, but husband excepted to this finding. The trial court Opinion states that both parties agree that this finding was incorrect and that they stipulated that the correct figure is $36,000. We assume that at some time after husband's exception on this point was filed, perhaps at oral argument on the exceptions (which was not transcribed), the parties reached this stipulation.

together as real estate agents, pooling their earnings from the real estate business.

At the time of the hearing, wife was 55 years old and husband was 56. Both were in good health and employed. Wife is still a real estate agent working on straight commission. In 1985, she earned $13,133. Husband has returned to his union plumbing job, earning $750 per week, and earns an additional $4,000–$5,000 a year teaching plumbing. This totals approximately $43,000–$44,000 per annum.

The parties separated in 1982. Immediately thereafter, husband filed this action for divorce. A master's hearing was conducted on March 31, 1986. The only issues before the master were certain equitable distribution issues. The parties had stipulated to the remaining distribution issues and to the entry of a divorce. Only the parties testified at the hearing.

On May 26, 1987, the master filed his report. Husband filed timely exceptions which were largely denied by the trial court. The court entered a final order dated August 6, 1987 adopting the master's recommendations in all respects with two exceptions. The court found that the master had undervalued the appreciation in the marital property, as to which the parties stipulated as noted above, and had failed to apply a reduction to the value of husband's pension to reflect the amount of the pension earned during marriage.[3] Husband timely appealed.

3. One of the master's recommendations was that the parties be divorced. The trial court accepted this recommendation in the order now on appeal, but did not enter a separate divorce decree. During the pendency of this appeal, a divorce decree was entered. Although we recognize that an appeal will not lie from a pre-divorce order of equitable distribution, since such an order is interlocutory, we will not quash the instant appeal since the decree has now been entered and the equitable distribution issues are now ripe for appeal. In *Campbell v. Campbell,* 357 Pa.Super. 483, 516 A.2d 363 (1986), we reached the same conclusion. We held that where the divorce decree had not been entered until after the appeal was taken due to a "procedural misstep", we would nevertheless entertain the appeal. *Id.,* 357 Pa.Superior Ct. at 489, 516 A.2d at 366. In the instant case, we cannot ascertain with certainty why the decree was entered after appeal of the original trial court order. The original order can be

Our scope of review in equitable distribution matters is limited. We must apply the Divorce Code to the record to determine whether the hearing court abused its discretion. *Ganong v. Ganong*, 355 Pa.Super. 483, 513 A.2d 1024 (1986). We will find an abuse of discretion only if the hearing court misapplied the law or failed to follow proper legal procedure. *Hutnik v. Hutnik*, 369 Pa.Super. 263, 535 A.2d 151 (1987); *Johnson v. Johnson*, 365 Pa.Super. 409, 529 A.2d 1123 (1987).

Husband's first argument centers on the trial court's exclusion of a portion of the value of the marital home from marital property. The trial court adopted the following two recommendations by the master regarding the home:

> That a portion of the marital home purchased with funds of Defendant [wife], acquired prior to the marriage, is herewith excluded from Equitable Distribution under Section 401(3)(1) [401(e)(1)] of the Divorce Code. (citations omitted)

> That the marital home is excluded from Equitable Distribution under Section 401(e)(3) of the Divorce Code because the land on which the dwelling was constructed was made a gift to Defendant by Plaintiff. The Plaintiff at the time of transfer stated to Defendant "I'd rather you (Defendant) have this property than Claire (Plaintiff's ex-wife)".

Section 401(e)(1) of the Code provides that property acquired in exchange for property acquired prior to the marriage is excluded from marital property except for the increase in value thereof during the marriage. Section 401(e)(3) provides that property acquired by gift is excluded from marital property except for the increase in value thereof during the marriage.

construed to have ordered both the divorce of the parties and the equitable distribution of their property and, thus, to be final. The trial court's later entry of a divorce decree was perhaps only intended to clarify this aspect of the prior order. In any event, the decree has now been entered and no purpose will be served by quashing this appeal.

Husband contends that he did not gift the property to wife when he transferred his interest in the property to her in 1972 because he lacked the requisite donative intent. He contends that his purpose was not to exclude the property from marital property, but rather to shield the property from his former spouse.

Husband also attacks the trial court's alternative conclusion that the property is excluded from marital property by virtue of the fact that $50,000 of the value of the property was acquired in exchange for property the wife had acquired prior to the marriage. He argues that to the extent that wife contributed her separate funds to construction of the home, those funds had already become marital property through wife's prior deposit thereof in the parties' joint savings account.

Our review of this issue has been rendered much more difficult than it need be by the unclear state of the record, the inartful argument and questionable representations regarding the facts by the parties, and the lack of a complete trial court opinion. In any event, we have arrived at the following analysis.

■ We agree with the trial court in its finding of a gift of the Hemlock Farms property by husband to wife in December 1972. At that time, the property's value would appear to be around $14,300, consisting of $7,300 in the price of the lot, $4,000 paid for initial construction work and $3,000 for the initial construction materials. All of this was paid for by wife with her pre-marital funds obtained from the refinance of her Long Island home. She gifted these amounts to the marital estate by investing them in the property, which was then held in joint names. *Brown v. Brown*, 352 Pa.Super. 267, 507 A.2d 1223 (1986) (property acquired prior to marriage that is transferred into property in joint names during marriage becomes marital property unless contrary intent is shown by clear and convincing evidence). However, when husband conveyed his interest in the property to wife by deed dated December 30, 1972, he

made a gift thereof back to wife, thus excluding the property at its then present value from marital property.

It matters not what husband's motive was in deeding the property to wife. As Justice McDermott opined in his concurring opinion in *Semasek v. Semasek*, 509 Pa. 282, 502 A.2d 109 (1985):

> A gift may be given to anyone. The law is cold in its definition, it does not ask a reason for the giving, only an intention, delivery and acceptance of the thing are required.... The question ought not to be what is the subject or the purpose of the gift, but rather whether was it intended as a gift, delivered and accepted.

*Id.*, 509 Pa. at 292, 502 A.2d at 113–14.

The fact that husband states that his only intent in deeding the property to wife was to prevent his former spouse from taking the property does not undermine our conclusion. As the *Brown* court concluded, the fact that there is some financial gain to be had by the gifting spouse as a result of the gift, like a reduction in taxes, does not negate donative intent, but rather positively suggests it. *Id.*, 352 Pa.Superior Ct. at 272, n. 3, 507 A.2d at 1225 n. 3. This is because the financial goal will only be attained if the gift is effected. The desire to achieve the financial goal is the source of the donative intent that supports a finding of a gift. *See also Sutliff v. Sutliff,* 518 Pa. 378, 387–388 n. 1, 543 A.2d 534, 539 n. 1 (Pa.1988) (donative intent found where husband transferred one-half interest in marital residence to wife during marriage for tax purposes).

Having concluded that husband gifted the property to wife in 1972 does not, however, end our analysis. The result of the gift is to exclude the property from marital property *except for the increase in value during marriage.* The property was worth approximately $14,300 when gifted, and is now worth $86,000 by stipulation of the parties.

The trial court determined that $50,000 of the value of the property was not marital property subject to eq-

uitable distribution. The trial court arrived at this figure by taking the total value of the property, $86,000, and deducting therefrom $36,000, the increase in value of the property due to the parties' joint construction efforts. The court reasoned that the $50,000 was actually property acquired in exchange for the wife's pre-marital assets and, therefore, excludable from marital property under Section 401(e)(1). The master concluded that the wife had expended a total of "at least $50,000" of her pre-marital assets, i.e., monies she obtained by refinancing and then selling her pre-marital home, in constructing the Hemlock Farms home. This amount the master and the trial court found to be non-marital property under Section 401(e)(1).

We disagree with this conclusion. It was wife's burden to prove that a portion of the value of the Hemlock Farms property was non-marital property because it was acquired in exchange for her pre-marital assets. *Sutliff v. Sutliff, supra,* at 384–388, 543 A.2d at 537–539 (party asserting that property acquired during marriage is not marital must prove by preponderance of the evidence that property falls within one of the exceptions to marital property enumerated in Section 401(e) of Code). We find that the evidence, even when taken in a light most favorable to wife, only reveals an investment in the Hemlock Farms property of a total of approximately $41,300 traceable to wife's separate funds. The record reveals the following investments:

| | |
|---|---|
| $ 7,300 | cost of lot |
| $ 4,000 | initial construction work |
| $ 3,000 | initial building materials |
| $27,000 | proceeds of sale of Long Island home used for additional building materials |
| TOTAL | |
| $41,300 | |

Thus, on the present state of the record, we do not know how the master concluded that the amount she contributed to the property was "at least $50,000", since the difference of $8,700 ($50,000 minus $41,300) is not directly accounted

for.[4] Moreover, as to the $27,000 that wife contributed to the construction of the home, we agree, at least in part, with husband's argument that a portion of these funds became marital property when wife deposited it in a joint savings account with husband on December 24, 1975.

Husband argues that all of this money was deposited by wife in the parties' joint savings account when wife first received it. There is no support in the record for this assertion. In fact, the record clearly shows that wife deposited the $27,000 in her personal savings account when she first received it and that husband could not remember where the money was put. Approximately one year later, when the balance in wife's account had diminished to almost $13,000, she transferred that amount to a joint savings account in both parties' names. The balance in that account was then used, according to wife, to continue to fund the construction of the Hemlock Farms property.

■ We find that when wife transferred the $13,000 to the joint account, she thereby contributed that amount to marital property. Where a spouse places separate property in joint names, a gift to the entireties is presumed absent clear and convincing evidence to the contrary. *See Brown*, 352 Pa.Super. at 273, 507 A.2d at 1225 (citing *In re Holmes Estate*, 414 Pa. 403, 200 A.2d 745 (1964); *Bold v. Bold*, 358 Pa.Super. 7, 516 A.2d 741 (1986); *Madden v. Madden*, 336 Pa.Super. 552, 486 A.2d 401 (1985).) Our conclusion that wife made a gift of this $13,000 to the marital estate when she deposited it in joint names is further buttressed by the fact that the money was thereafter used to make further improvements to the Hemlock Farms property which, although held in wife's name, was the joint project and

4. We do note that it would appear that this amount is approximately the amount by which the property increased in value between the parties' separation in 1982 and the hearing in 1986, since wife testified that the property was worth about $78,000 in 1982. Therefore, it may be that the master attributed all of this post-separation appreciation solely to wife, perhaps because she resided in the home post-separation, made all mortgage payments and made certain minor improvements thereto, and thus arrived at a final figure of $50,000.

marital residence of the parties.[5]  In summary, we can conclude, even from the incomplete and unclear state of the record before us, that wife actually proved only that the Hemlock Farms property was gifted to her during the marriage when it was worth $14,300 and that she thereafter exchanged a total of $14,000 ($27,000 minus $13,000) in pre-marital assets for materials used in improving the property.  This totals $28,300 of the value of the home that is non-marital property.  The remaining $13,000 of wife's pre-marital assets that were invested in the Hemlock Farms property were contributed to the marital estate when transferred to joint names.

■  Thus, we must reverse the trial court's conclusion that only the $36,000 of the value of the home due to the parties' joint efforts in constructing it is marital property. At least an additional $13,000 worth of value in the home is also marital property.  Moreover, since the state of the record regarding the additional $8,700 in value in the home is unclear, we must remand to the trial court for reconsideration and clarification of its decision regarding this portion of the home's value.  In reconsidering this aspect of its decision, the trial court should consider that if this aspect of the value of the home is simply post-separation increase in value, and not attributable to a proven exchange by wife for pre-marital assets, it too may be considered marital property and equitably distributed between the parties.

■  Husband also challenges the trial court's distribution to wife of eighty percent (80%) of the $36,000 increase in value of the Hemlock Farms property due to the parties' efforts in constructing it.  Husband argues that since the evidence clearly shows that both parties contributed equally in working on the home, the division should also have been equal.

5.  *Campbell v. Campbell,* 357 Pa.Super. 483, 516 A.2d 363 (1986), is not to the contrary.  In *Campbell,* we simply held that when funds acquired by gift to one spouse are simply passed through a joint bank account for a very limited period of time, they are not thereby automatically converted to marital property.  *Id.,* 357 Pa.Superior Ct. at 490, 516 A.2d at 367.

Since we must remand for a reconsideration of the trial court's determinations regarding the amount of the value of the marital home that is to be classified as marital property, we will also remand for a reconsideration of the division of the $36,000 increase in value. In this manner, we will insure that the trial court will give complete reconsideration to all issues pertinent to the home in light of this Opinion. We underscore that the trial court correctly determined that it was not required to divide the $36,000 equally between the parties. The record reveals that the master properly considered the factors listed in the Divorce Code in distributing the $36,000, and clearly based its decision in part on the fact that husband's earning power now substantially exceeds wife's and in part on the fact that the contributions of the parties to the construction of the home is only one of many factors the Code requires a court to consider in distributing the property. 23 P.S. § 401(d)(7).

■ Husband next challenges the trial court's inclusion in marital property of the proceeds of a sale of jointly held stock in the amount of approximately $2,300 and of approximately $1,100 which had been in the parties' joint checking account at the time of separation. The master found that the stock and the proceeds of husband's sale thereof were marital property and distributed it equally between the parties. As to the amount that had been in the joint checking account, the master also correctly found it was marital property. The fact that husband had appropriated the money to his own use did not change the categorization of the property.

Husband's only challenge is to the classification of this property as marital. Husband relies on Section 401(e)(5), which excludes from marital property all property which a spouse has "sold, ... or otherwise disposed of in good faith and for value" prior to commencement of divorce proceedings. Pa.Stat.Ann. tit. 23, § 401(e)(5) (Purdon Supp.1987). He contends that the master improperly classified the subject property as marital because husband allegedly disposed of this property in good faith by using it to satisfy joint

obligations of the parties. Husband cites *Duff v. Duff*, 510 Pa. 251, 507 A.2d 371 (1986), for the proposition that although joint property which is used by one party to satisfy personal obligations is not considered as having been disposed of in good faith and, therefore, is still divisible marital property, marital property *is* disposed of in good faith and is excluded from marital property if it is used to satisfy the parties' joint obligation, even if it is so used after separation.

■ Although we agree with husband's description of the applicable law, we also agree with the trial court finding that in this case, husband did not establish that any of these funds were in fact used to satisfy joint obligations. Since the burden of proof on this issue was clearly on the husband, we have no trouble in affirming the trial court's conclusion on this issue.

■ Husband also challenges the trial court's inclusion of approximately $4,500, which was in the parties' joint savings account, in marital property. As to this account, even less evidence as to the ultimate disposition of the funds appears in the record. Husband did not show, by a preponderance of the evidence, that he expended these funds for joint obligations. Thus, we again affirm the trial court's conclusion that this amount is properly included in distributable marital property.

■ Husband's penultimate issue on appeal concerns the trial court's distribution of certain commissions jointly earned by the parties in the conduct of their real estate business during their marriage, but not received until after they had separated. These commissions, totalling approximately $10,400, are concededly marital property, the right thereto having accrued to the parties jointly during the marriage. *Diamond v. Diamond*, 360 Pa.Super. 101, 109, 519 A.2d 1012, 1016 (1987). Husband's challenge is to the trial court's distribution of seventy percent (70%) of these commissions to wife. Husband's argument is that because during the marriage the parties evenly divided the commis-

sions they earned, the same division should be awarded in equitable distribution.

We reject husband's argument regarding the distribution of the commissions on two grounds. First, the record does not establish that the parties had any actual agreement regarding division of commissions earned. The testimony of both parties was simply that all commissions were commingled and used by the parties jointly for whatever purpose they desired. Thus, we do not find any evidence of an agreement between the parties as to how the commissions would be divided between them.

Furthermore, even if the parties had any such agreement applicable to the division of commissions during marriage, this would clearly not compel the court to apply the same division in equitable distribution. In equitable distribution, the factors to be considered are those listed in the Code and any others the trial court properly deems relevant. In this case, the trial court concluded that the evidence showed that wife had participated in earning the commissions in question and, in light of wife's minimal present earning capacity, found it equitable to award her a larger share of the commissions. We find no abuse of discretion in this ruling.

Lastly, husband attacks the trial court's division of husband's pension. Once again, husband does not dispute that a portion of the value of the pension is marital property. In fact, husband does not even challenge the trial court's distribution of almost fifty percent (50%) of the value of the marital property portion of the pension to wife. Husband alleges only that the trial court's valuation of the pension was in error.

Since the record regarding the pension is incomplete, we can glean only the following pertinent facts. As a union plumber, husband appears to have begun accruing pension benefits in 1969. Husband continued to accrue these benefits during the marriage from 1971 through 1976, when he terminated his employment as a union plumber. Husband returned to his union plumbing work and continued to

accrue benefits at some point after the parties separated. On questioning by counsel for wife, husband also read into the record a letter from his union directed to counsel for wife. The letter indicated that husband had "... vested pension credit of one-twelve [sic] quarters or 28 years at age 65." The letter further stated that "[u]nder present conditions he would be entitled to a benefit of $280 per month. The benefit is completely employer contributed." No further information was elicited.

In response to a request by the master at the hearing, counsel for husband agreed to and did employ an actuary to calculate the present value of husband's pension and submit a report directly to the master. Wife did not object to this procedure, apparently waiving her right to cross-examine the actuary.

The actuary's report provided two alternative valuations. The actuary, apparently on his own initiative, provided the master both with what was called a "Level Benefits" valuation of $2,963.00 as of April 1, 1987 and an "Inflation Adjusted Benefits" valuation of $4,981.00 as of April 1, 1987. The actuary explained his inflation adjusted valuation technique as follows:

> The true return on money is estimated to be between 2% and 3% by most economists, the balance of the return on money being attributed to an "inflation premium". Since Mr. Lowry's retirement benefit will not be payable for approximately nine years, it may be anticipated that in that time the value of a dollar of benefits will have decreased substantially. That being the case, we have also calculated the present value of Mr. Lowry's retirement benefit (Inflation Adjusted Benefit) assuming an interest rate of 2½% per annum so that at retirement the value of the pension will have been approximately adjusted to reflect inflation over the intervening years.

Thus, the actuary's inflation adjusted benefit calculation reflects less of a discount of the future value of the pension in reaching present value than would a present value calculation that discounted the future value by using a discount

figure simply based on interest rates. The discount is less because interest rates are considered to be partially offset by the decrease in value of money received in the future resulting from inflation.

The master chose to accept the higher valuation figure, i.e., the inflation adjusted figure, and ordered that approximately fifty percent (50%) of that value be awarded to wife. The trial court accepted this recommendation, but found that the actuary had failed to reduce the total present value of the pension to reflect that only a portion of it was accrued during the marriage.[6] Thus, the court reduced the actuary's value and awarded approximately fifty percent (50%) to wife.

On appeal, husband contends that the trial court erred in accepting the inflation adjusted present value figure. Wife argues that the increase in pension value due to the use of an inflation factor is proper. Although there is admittedly no Pennsylvania case directly on point, wife argues that *Kaczkowski v. Bolubasz*, 491 Pa. 561, 421 A.2d 1027 (1980), supports her position by analogy.

In *Kaczkowski*, the Supreme Court decided that in calculating the future earning power element of damages in wrongful death and survival actions, it was appropriate to consider the projected effect inflation would have had on the deceased's future earnings. *Id.*, 491 Pa. at 584, 421 A.2d at 1039. The court regarded inflation as a constant reality in our economy. However, since the court found that historically inflation rates and interest rates have generally been parallel, the court held that the proper method of considering the effect of inflation on future earnings would be as a total offset to any discount to present value of those earnings based on interest rates. Thus, the court

---

**6.** This finding appears to be erroneous and should also be reconsidered on remand. In fact, it would appear that the actuary did reduce the value of the pension in consideration of the fact that only part of it was accrued during marriage by reducing the monthly benefit husband could expect to receive to a number representing that amount the husband would have received if he had accrued pension credits only for the five years he was a union employee during the marriage.

adopted what is called the "total offset" method of considering inflation. It is so-called because inflation is regarded as a "total offset" of any present value discount based on interest rates. *Id.*

We do not agree with wife's argument that the use of an inflation factor in arriving at the present value of a pension is necessarily appropriate or is compelled under the rationale of *Kaczkowski*. Rather, we find that the appropriateness of using an inflation factor is completely dependent upon the terms of the individual pension at issue. Since we do not have on the record before us sufficient information concerning those terms of husband's pension which are relevant to the use of an inflation factor, we will remand this matter to the trial court for reconsideration of the pension issue.

Our assessment of the appropriateness of the use of an inflation factor in calculating present value is based on a careful analysis of existing Pennsylvania case law concerning valuing and equitably distributing pension benefits. It is now well-established that under Pennsylvania law, pensions are to be considered marital property subject to equitable distribution upon divorce. *Braderman v. Braderman,* 339 Pa.Super. 185, 488 A.2d 613 (1985); *King v. King,* 332 Pa.Super. 526, 481 A.2d 913 (1984). Both vested and unvested, matured and unmatured retirement benefits may be marital property. *Flynn v. Flynn,* 341 Pa.Super. 76, 491 A.2d 156 (1985).

It is also well-established that there are two basic approaches to equitably dividing this form of marital property: the immediate offset method and the deferred distribution method. Deferred distribution has been held to be the preferred method of equitably dividing unvested retirement benefits which may never actually be received by the employee spouse because of possibilities like early termination or death. It is also preferred where the parties' other assets are insufficient to offset an award of a share of the pension to the non-employee spouse. *DeMasi v. DeMasi,* 366 Pa.Super. 19, 50, 530 A.2d 871, 886 (1987). Deferred distribution accounts for the uncertainties sur-

rounding an unvested pension by requiring that the non-employee spouse receive an equitable share of the benefits only when they are actually received. The court retains jurisdiction and may either determine what share of the benefits the non-employee spouse should receive and merely defer payment, or may defer both the determination of the share to be paid and payment. *Flynn*, 341 Pa.Super. at 91–92, 491 A.2d at 164–65 (Beck, J., dissenting). Since deferred distribution does not contemplate a present distribution of assets, no present value of the pension need be calculated. *Id.*

■ The other method of equitably distributing pension benefits, the immediate offset method, is the one utilized by the trial court in the instant case, presumably because husband's pension is vested and the parties' other assets are sufficient to warrant a present award. The immediate offset method requires a calculation of the present value of the pension benefits because the non-employee spouse will receive an actual present distribution of marital assets to provide him/her with an equitable share of the pension even though the pension itself will not actually be received by the employee spouse until some time in the future. The present value is the estimate of the present worth to the employee spouse of these future benefits. *Id.*, 341 Pa.Superior Ct. at 88–89, 491 A.2d at 163 (Beck, J., dissenting).

■ Although arriving at a present value of pension benefits involves an actuarial process that appears mystifying at first blush, this court has recently provided a clear explanation of the proper method of calculation. In *DeMasi v. DeMasi, supra,* we determined that the proper approach was to begin by calculating the amount of the monthly pension benefit if it were assumed that the employee was at retirement age with a fully vested pension based upon compensation and plan provisions as of the date of separation. We must then determine the value of the monthly benefit the employee spouse will receive at age 65. This is computed based on the employee's life expectancy and the appropriate interest rate. *Id.*, 366 Pa.Superior Ct. at 50, 530 A.2d at 886.

At this stage, the value of the pension to the employee at age 65 has been ascertained. However, next we must establish the present value of the pension benefits because the court must presently distribute to the non-employee spouse a portion of the projected benefits, although those benefits will not actually be received by the employee spouse until some time in the future. This valuation will be as of the date of the hearing.[7] *Braderman*, 339 Pa.Super. at 195–196, 488 A.2d at 619; *King*, supra. Thus, the value of the benefits must be reduced accounting for interest rates and other contingencies like mortality. This calculation results in the actual present value of the employee spouse's benefits payable at age 65 computed as of the date of hearing.

■■■■ If the pension is not yet fully vested and immediate offset method of distribution is nevertheless used, a further

---

**7.** We note that there has been commentary in certain cases decided after *Braderman* which, on its face, may appear to inject confusion as to the date as of which the valuation should be made. In fact, these cases are perfectly consistent with the *Braderman* court's clear statement that valuation is to be made as of date of hearing.

First, we are aware that the *DeMasi* court began its discussion of the present value calculation method by stating that "[p]resent value of husband's interest in the defined benefit plan as of September 1, 1982 [the date of *separation* ], is the amount available for equitable distribution." *DeMasi*, 366 Pa.Super. at 50, 530 A.2d at 886. This statement does not address the time as of which the present value calculation is done. It merely reiterates the long accepted principle that only the interest of the employee in the pension plan that accrued during the marriage is marital property and therefore distributable. It is, in other words, another way of stating that the degree to which the employee accrues additional benefits after separation, these additional benefits are property acquired after separation and not marital.

This principle was recently refined in *Hutnik v. Hutnik*, 369 Pa.Super. 263, 535 A.2d 151 (1987). There, the court noted that although in general only the portion of the pension attributable to the period commencing with marriage and ending with separation was marital property, where a pension has vested and increases in value after separation for reasons aside from contributions of the parties, such increase is marital property. *Id.*, 369 Pa.Superior Ct. at 266, 535 A.2d at 153–53.

This exception to the rule regarding what portion of the pension is marital property in no way affects the date as of which the value of that portion is fixed, i.e. the date of hearing.

discount to reflect the contingencies attendant on vesting is applied.

■■■ Lastly, the coverture fraction must be applied. The coverture fraction is applied to insure that only the portion of the pension that is marital property, i.e. that was acquired during marriage, is actually divided. The numerator of the fraction is the period of the employee-spouse's participation in the pension plan during marriage. The denominator is the total period of time the employee spouse was accruing benefits.

In the instant case, the present value calculation is confusingly reported in the actuary's report and we do not have the benefit of any testimonial explanation by the actuary of the methods he used. We also have totally insufficient information regarding the actual terms of husband's pension plan on which the calculation is based. Because of these deficiencies in the record, our analysis of the appropriateness of the actuary's use of an inflation factor has been rendered somewhat difficult.

Nevertheless, in broad terms, we understand the actuary to have reasoned that since the true value of money over time does not merely increase because of interest, but also actually decreases because of the effect of inflation, husband's benefits should be discounted only at a rate reflecting this "real" growth, i.e. interest minus inflation. Thus, in the third step of the *DeMasi* present value calculation, the discount based on interest rates should be less and the final value figure would therefore be higher.

■■■ Although in economic theory this may be correct, the point in valuing a pension for equitable distribution purposes is to estimate as accurately as possible the real present value of a future and somewhat contingent marital asset and to equitably distribute it in the present. When viewed from this perspective, it is clear that the only circumstance when the use of an inflation factor is appropriate is where the specific pension plan at issue provides for an increase in benefits over time to protect the employee

spouse from the effects of inflation. In such a case, it is equitable to provide a share of this aspect of the benefit plan to the non-employee spouse. This may be done by employing a lower discount rate in calculating present value. However, where the specific pension plan at issue does not provide for an increase in benefits based on inflation, it is clearly inappropriate to include an inflation factor and thus raise the present value of the pension for purposes of equitable distribution. To do so protects the non-employee spouse against inflation despite the fact that the employee spouse has no such protection under the terms of his/her pension plan. In other words, the protection against inflation is simply not part of the benefit package that is being valued and distributed.

Although the appropriateness of considering the effects of inflation in valuing pensions in equitable distribution has not previously been addressed by a Pennsylvania appellate court,[8] the courts of New Jersey have confronted this issue and are in accord with the foregoing analysis. In *DiPietro v. DiPietro*, 193 N.J.Super. 533, 475 A.2d 82 (A.D.1984), the trial court had refused to discount the value of the husband's pension based on interest rates because it found that interest rates were totally offset by inflation rates. The Appellate Division reversed, stating:

> The trial judge mistakenly discounted the future value of this fixed pension by employing the method used in a

**8.** We have referred in passing to the possibility of considering inflation in arriving at the present value of a pension. In *Flynn v. Flynn, supra,* for example, this writer quoted with approval from Skoloff, *How to Evaluate and Distribute Employee Benefits in a Divorce,* Nat.'l L.J., February 13, 1984, at 25, where inflation was mentioned as a possible factor in the actuarial calculation of present value. *Id.,* 341 Pa.Superior Ct. at 89, 491 A.2d at 163. In *Teribery v. Teribery,* 357 Pa.Super. 384, 516 A.2d 33 (1986), we referred with approval to this language from the *Flynn* dissent. *Id.,* 357 Pa.Superior Ct. at 390, 516 A.2d at 36. Since the *Teribery* opinion does not specifically address the use of an inflation factor, the precise terms of the pension plan involved therein or the circumstances under which such a factor might be appropriate, the case provides us with no guidance as to the issue presented herein.

wrongful death action. The object there, however, is to discount to present value the dependent's share of the decedent's projected earnings over what would have been his remaining work-life expectancy. Even if those earnings would not increase in real terms, they would tend to rise because of inflation. Future earnings being discounted to present value must therefore be inflated over earnings at death to take into account this inflationary factor.... By contrast, fixed pension payments are unaffected by inflation and should not be inflated to offset the interest discount.

*Id.* at 538, 475 A.2d at 85.

Thus, as the *DiPietro* court explained, the holding of *Kaczkowski* is simply inapplicable to present valuation of pensions which do not by their own terms account for inflation. In a wrongful death action, the court is forced to speculate as to what the decedent would have earned in the future. As the *Kaczkowski* court opined, sound economic theory requires a court to consider the effect inflation would have had on the decedent's earnings. In pension valuation, the court need not speculate as to whether inflation would affect the benefits to be paid. The pension plan itself either provides for inflation adjustment or it does not.

In the instant case, we do not have sufficient information to determine whether husband's pension plan includes a provision for benefit increases to account for inflation or, if it does, what rate of inflation is used by the plan. Without such information, we cannot review the actuary's calculation. Therefore, we will remand for the development of a complete record regarding husband's pension and for reconsideration of the present value calculation, based upon the *DeMasi* formula, including the appropriateness of the use of an inflation factor.

The order of the trial court is affirmed in part, reversed in part and the case is remanded for further proceedings consistent with this Opinion. Jurisdiction is relinquished.