664 A.2d 551

**Maryann MATLOCK a/k/a Maryann E. Stranko Matlock, Appellee,**

v.

**Joseph MATLOCK a/k/a Joseph D. Matlock, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 11, 1995.

Filed July 21, 1995.

Reargument Denied Sept. 26, 1995.

508

Thomas H. Tropp, Philadelphia, for appellants.

Howard M. Goldsmith, Philadelphia, for appellee.

Before BECK, KELLY and HOFFMAN, JJ.

BECK, Judge:

In this appeal, we are asked to determine whether the trial court erred in its interpretation and enforcement of the Property Settlement Agreement ("PSA") entered into by appellant, Colonel (retired) Joseph D. Matlock ("husband") and his former spouse, appellee, Maryann E. Stranko Matlock ("wife"). Specifically, we must interpret the division of pension benefits under the PSA. We affirm the trial court.

The factual history and procedural posture of this case are as follows. The parties were married on December 21, 1963. The following year, in August 1964, husband entered the United States Air Force ("USAF"). After serving in Vietnam, husband entered law school. Husband completed law school in 1973 while still on active duty in the USAF. When he completed law school, husband attained the rank of senior captain.

By decree and order dated May 5, 1987, the parties were divorced. This decree and order fully incorporated the PSA

which the parties had executed on February 8, 1987. But the decree and order did not merge with the PSA and the PSA survived the decree and order. The court also issued a Qualified Domestic Relations Order ("QDRO") that attempted to effectuate the portions of the PSA regarding distribution of the pension. The QDRO was in the form agreed to by the parties and attached as an exhibit to the PSA.

Prior to the parties' May 5, 1987 divorce, on October 1, 1985, husband was promoted from lieutenant colonel to colonel. Husband's rank was colonel when the parties divorced. However, to receive a colonel's pension upon his retirement, husband had to retire on or after October 1, 1988. Consequently, if husband had retired from the USAF on the date that the parties were divorced, husband would have only been eligible to receive the pension of a lieutenant colonel. Husband evidenced no intent to retire on May 5, 1987.

Husband eventually retired from the USAF on September 1, 1992. He was still a colonel and he had qualified to receive a colonel's pension benefits. At the time husband's pension benefits were initially distributed to him and wife pursuant to the QDRO, wife received one-half of husband's pension benefits based on a lieutenant colonel's salary, i.e., the amount she was entitled to on the day of divorce. The remainder of husband's pension benefits were paid to husband.

On June 25, 1993, wife petitioned the trial court to enforce the PSA, claiming that she and husband had agreed that she was entitled to receive one-half of a colonel's pension benefits because husband had accrued a colonel's pension benefits when he retired. Husband answered wife's petition claiming that he and wife had agreed that she was only entitled to receive one-half of the lieutenant colonel's pension benefits which husband had accrued at the time of the parties' divorce.

Wife filed a motion *in limine* in which she sought to exclude any and all parol evidence with regard to the interpretation of the PSA. After husband responded to wife's motion *in limine,* the trial court granted wife's request.

At the evidentiary hearing in the case in chief both parties testified. Wife also presented the testimony of Stephen Glassman, an expert in the field of military pension law. The trial court expressly stated that Glassman's testimony only informed it of the intricacies of the Uniformed Services Former Spouses Protection Act[1] and did not aid the trial court in its interpretation of the PSA. Trial Court Supplemental Opinion at 1–2.

The trial court issued its memorandum and order which granted wife's motion to enforce the PSA. The court in interpreting the PSA found the QDRO was not part of the contract. At that time, the trial court also issued a new Qualified Military Retirement Order ("QMRO") for the purposes of effectuating its interpretation of the PSA because it deemed the original QDRO inadequate. Husband appealed.

Husband raises the following issues for our review:

1. Did the lower court err in holding that the property settlement agreement executed by the parties on February 8, 1987 ("PSA") and the military order (qualified domestic relations order) (hereinafter referred to as the "the [sic] QDRO") provide for appellee's receiving one-half of the retired pay which appellant began receiving when he retired on September 1, 1992 rather than one-half of the retired pay which he was entitled to as of the date of divorce, May 5, 1987?

2. Did the lower court err when it determined that the QDRO, which is referred to in paragraph thirteenth of the PSA and a copy of which is attached to the PSA as exhibit B, is not part of the parties [sic] agreement?

3. Did the lower court err by not finding that the terms of the PSA and QDRO supported appellant's contention regarding the division of his retired pay?

4A. Did the lower court err by not finding that the pertinent terms of the PSA and QDRO were ambiguous?

1. 10 U.S.C. § 1408 *et seq.*

4B. Did the lower court err by not construing the PSA and QDRO against appellee since her representatives drafted both?

5. Did the lower court err by granting appellee's motion in limine?

6. Did the lower court err by allowing Stephen Glassman, Esquire to testify and offer his opinion regarding the meaning of the terms of the PSA and the QDRO?

Appellant's Brief at 4.

We first address wife's contention that husband's appeal is interlocutory. Wife claims that husband's appeal is not properly before this court because the trial court retained jurisdiction over the QMRO to supervise and enforce the payment of husband's pension benefits and failed to enter a final monetary judgment in this case. We disagree.

Appeals can be taken only from final orders, unless a statute or rule of court provides otherwise. *Foflygen v. R. Zemel, M.D. (PC)*, 420 Pa.Super. 18, 28, 615 A.2d 1345, 1350 (1992), *allocatur denied*, 535 Pa. 619, 629 A.2d 1380 (1993) (citing *Pugar v. Greco*, 483 Pa. 68, 72–73, 394 A.2d 542, 544–45 (1978)); Pa.R.App.P. 341(a). A final order is one which "serves to put the litigant out of court either by litigation or disposing of the case entirely." *Foflygen*, 420 Pa.Super. at 28, 615 A.2d at 1350 (citing *Bender's Floor Covering v. Gardner*, 387 Pa.Super. 531, 564 A.2d 518 (1989)). The QMRO which effectuates the trial court's interpretation of the PSA pertinently orders the following:

K. Judgement [sic] in the amount of ($ ) (Exact amount to be determined by the appropriate authority (Plan Administrator) with notification to be sent to this Court, Petitioner and Respondent, when such sum is calculated. Counsel for the respective parties are directed to record such judgment in the jurisdiction deemed appropriate) is hereby entered in favor of MARYANN MATLOCK and against JOSEPH MATLOCK, said sum being the difference between the pension payments actually paid to the Petition[er] [sic] and the amount owed by the Respondent to the

Petitioner pursuant to this Court's Decree and Order of Divorce dated May 5, 1987.

QMRO at 9. This provision awards appellee an ascertainable sum which is to be ministerially determined by the plan administrator. No additional hearings will be required in this case to determine the amount of the judgment entered by the trial court. Thus, the QMRO is a final order as it puts the appellant out of court. Moreover, the fact that the trial court expressly retained the ability to supervise and enforce the payment of husband's pension benefits is irrelevant; a trial court can enforce all of its orders, even when an appeal is pending. Pa.R.App.P. 1701(b)(2). *See Tanglwood Lakes Community Ass'n v. Laskowski,* 420 Pa.Super. 175, 616 A.2d 37 (1992) (absent stay or supersedeas, trial court possessed the ability to enforce order which was being appealed by imposing sanctions against appellant for lack of compliance). Therefore, wife's claims regarding the appealability of the QMRO are meritless.

Although husband raises six separate issues, he is basically challenging the court's conclusion that wife is entitled to one-half of the full colonel's pension instead of one-half of the lieutenant colonel's pension.

Husband contends that the trial court erred in finding that the QDRO was not part of the PSA, thereby considering the QDRO to be parol evidence which he did not consider in interpreting the PSA. Specifically, husband avers that the PSA and the QDRO are both parts of the entire agreement of the parties. We agree with husband.

■ Property settlement agreements are governed by the general rules of contract interpretation. *Krizovensky v. Krizovensky,* 425 Pa.Super. 204, 211, 624 A.2d 638, 642 (1993), *allocatur denied,* 536 Pa. 626, 637 A.2d 287 (1993) (citing *D'Huy v. D'Huy,* 390 Pa.Super. 509, 568 A.2d 1289 (1990)). "[W]hen a contract refers to a separate document, a court may examine the language of the other document to ascertain the intent of the parties." *West Development Group, Ltd. v.*

*Horizon Financial, F.A.,* 405 Pa.Super. 190, 592 A.2d 72, 75 (1991).

█ Instantly, the QDRO was attached to the PSA as an exhibit and the PSA specifically refers to the QDRO as an exhibit. The parties' execution of the PSA and consent to the QDRO were contemporaneous. Most importantly, the PSA and the QDRO are substantively intertwined because both address the distribution of husband's pension benefits between the parties.[2] Therefore, we conclude that the PSA cannot be correctly interpreted without reference to the QDRO because the two documents combine to form the parties' agreement as to the pension.

The following are the only portions of the PSA in which the pension is addressed:

13. (a) The parties acknowledge that Husband has acquired during the marriage a military pension. It is the intention of the parties to equally divide the benefits from the pension when said pension is in pay status. Moreover, the Husband agrees to elect to provide an annuity to Wife under the Survivor Benefit Plan Option. The Parties specifically agree that Wife shall receive benefits from the pension and under the Survivor Benefit Plan regardless of whether or not either party remarries.

(b) It is recognized by and between the parties that in order to effectuate this pension transfer, a "Qualified Domestic Relations Order" shall be necessary. The parties agree to sign whatever documents are necessary to effectuate the Qualified Domestic Relations Order. A copy of said Order is attached hereto as Exhibit "B".

The relevant portions of the QDRO provide:

2. Both the trial court and wife state that the QDRO cannot be part of the PSA because it is a court order which has the purpose of effectuating the pension provisions of the PSA. We acknowledge that the QDRO is required by the Plan Administrator to effectuate the distribution of husband's pension. But we do not understand why it cannot also be considered to be part of the PSA, especially when the PSA specifically refers to the QDRO and the QDRO is attached to the PSA as an exhibit. Moreover, the QDRO became part of the PSA on February 8, 1987, approximately *three months before it was issued as a court order.*

1. The parties hereto are husband and wife, and a divorce action is presently pending/has been completed/in this Court at the above number;

2. The parties have been married ten or more years during which Defendant husband was in military service.

3. Colonel Joseph Matlock ... hereinafter referred to as "Defendant" or "Participant", is on active duty in the Armed Forces and is a participant in the Armed Forces Retirement System ("Plan").

4. Maryann Matlock ... hereinafter referred to as "Plaintiff" or "Alternate Payee", has raised claims for, *inter alia*, equitable distribution of marital property. . . .

. . . .

IT IS ORDERED, ADJUDGED AND DECREED as follows:

1. A portion of the Plan is marital property subject to distribution by this Court.

2. The marital property component of the Plan is one-half (fifty percent) of the projected pay status gross monthly pension income. The portion to be segregated for the Alternate Payee is fifty percent (50%) of the Participant's full retirement benefit.

3. The benefits shall be payable to the Alternate Payee on the date on which the Participant attains retirement age, as if the Participant had retired on that date even if the Participant has not actually retired or separated from service.

4. (a) The parties acknowledge that Husband has acquired during the marriage a military pension. It is the intention of the parties to equally divide the benefits from the pension when said pension is in pay status. Moreover, the Husband agrees to elect to provide an annuity to Wife under the Survivor Benefit Plan Option. The parties specifically agree that Wife shall receive benefits from the pension and under the Survivor Benefit Plan regardless of whether or not either party remarries.

(b) It is recognized by and between the parties that in order to effectuate this pension transfer, a "Military Order" ("Qualified Domestic Relations Order") shall be necessary. The parties agree to sign whatever documents are necessary to effectuate the Order.

5. The term of said payments is for the life of the Alternate Payee.

6. The Plan to which this Order applies is the Armed Forces Retirement System or any successor plan thereto.

7. The Alternate Payee shall have the same rights with regard to her portion of the Plan as are available to the Participant with regard to his remaining portion of the Plan. In no event shall the Alternate Payee have greater rights than those which are available to the Participant. The Alternate Payee is not entitled to any benefit not otherwise provided under the Plan.

 In interpreting the terms of the PSA and the QDRO set forth above, our only task is to ascertain the contracting parties' intent. We underscore the fact that property settlement agreements are governed by the same principles of contract interpretation that apply to any other contract. *D'Huy v. D'Huy*, 390 Pa.Super. 509, 568 A.2d 1289 (1990) (en banc). Under those principles, the court's role is not to remake the parties' agreement, but rather simply to interpret and enforce it.

The core facts to which the above-quoted contractual terms must be applied in this case can be distilled into the following:

1. As of the date the Agreement was executed and as of the date the parties divorced and the QDRO was entered (all of which occurred in 1987), appellant was entitled to retire and receive a lieutenant colonel's pension.

2. As of the same time, appellant had already been promoted to the rank of full colonel and had served as such for one and one-half years. However, appellant did not yet qualify for a colonel's pension, which yields retirement benefits that are substantially higher than those paid under a lieutenant colonel's pension. To receive the colonel's

pension, appellant had to continue to serve for an additional one and one-half years after the divorce.

3. Appellant did not retire and accept a lieutenant colonel's pension as of the date of divorce and there is no evidence that he intended to do so when the parties executed their Agreement.

4. Appellant continued to serve in the military as a full colonel for over five more years after the divorce. He retired in late 1992 and began receiving a full colonel's pension.

5. Appellee has received an amount equal to approximately one-half of the pension benefits appellant would have received if he had retired as of the date of divorce and had accepted a lieutenant colonel's pension.

Husband argues that when the terms of the PSA and QDRO are applied to the foregoing facts, it is clear that wife is only entitled to fifty percent of a lieutenant colonel's pension. The trial court disagreed, awarding wife fifty percent of the full colonel's pension which husband was actually receiving.

■ Paragraph 13 of the PSA sets forth wife's rights regarding a distribution of the pension. The PSA expressly states that the wife will receive fifty percent of whatever husband receives when the pension is actually paid out, i.e. "when said pension is in pay status." [3]

The QDRO also supports this interpretation. The parties agreed that one-half of the "projected" pay status is to go to wife and that the "portion to be segregated" for wife is fifty percent. The language referring to pay status, when read in the context of the whole PSA and the whole QDRO, indicates that wife was to receive the portion of the "projected" and

3. Expert testimony taken by the trial court indicated that "pay status" is a defined term in the area of military pensions. In that context, the phrase "pay status" means "when the pension is actually being paid." This fact is not disputed. *See Krizovensky v. Krizovensky,* 425 Pa.Super. 204, 624 A.2d 638 (1993) (where property settlement agreement regarding division of pension uses terms that are clearly defined within context of retirement system at issue, contract is not ambiguous as to meaning of those terms, and accepted definition is that given to those terms within context of that retirement system).

presently unknown amount appellant would actually receive when he did retire and the pension entered pay status. This is what the PSA and the QDRO refer to throughout: the amount wife is to receive is one-half of what husband receives when he retires and the pension enters pay status.

Husband disagrees and argues in his brief that the following language found in paragraph 3 of the QDRO shows that wife's intent was that she receive less than fifty percent of a full colonel's benefits.

The benefits shall be payable to ... [wife] on the date on which ... [husband] attains retirement age, as if ... [husband] had retired on that date even if ... [husband] had not actually retired or separated from service.

Husband's argument that paragraph 3 demonstrates that wife never expected to receive fifty percent of the pension husband is now receiving is not persuasive. The foregoing language refers specifically to time of payment, not to amount. The amount of payment is covered both in paragraph 13 of the PSA and in paragraph 4(a) of the QDRO, both of which state in identical language that wife is to receive fifty percent of the amount of the pension when it is in pay status. In addition, paragraph 2 of the QDRO states that the amount wife is to receive is fifty percent of husband's "full retirement benefit." The parties' intent on this subject is clearly and expressly set forth in these paragraphs of the PSA and the QDRO.

Lastly, we address the remaining questions presented by husband, the admission of Glassman's expert testimony on military pensions. The trial court admitted Glassman's expert testimony solely for the limited purpose of informing it about the intricacies of military pension law. The trial court acted within its discretion. We, therefore, conclude the trial court did not err.

Order affirmed.

KELLY, J., files a dissenting opinion.

KELLY, Judge, dissenting:

I dissent. Although I join the portions of the majority opinion holding that this appeal is not interlocutory and that the PSA and the QDRO combine to form one contract, I believe that the majority's interpretation of this contract is incorrect. I interpret this contract to divide only the marital portion of appellant's military pension. Further, I would employ coverture fractions to determine what the marital portion of that pension actually is. Accordingly, I would reverse the trial court's order and remand with instructions.

When interpreting contracts, the paramount concern of a court is to determine the intent of the parties. *Walton v. Philadelphia Nat. Bank*, 376 Pa.Super. 329, 338, 545 A.2d 1383, 1388 (1988). In determining the intent of the parties to a contract, all provisions of a contract must, if possible, be given effect. *Krizovensky v. Krizovensky*, 425 Pa.Super. 204, 211, 624 A.2d 638, 642 (1993). When a contract's provisions are clear and unambiguous, the parties' intent must be ascertained from the contract itself. *Steuart v. McChesney*, 498 Pa. 45, 48–49, 444 A.2d 659, 661 (1982); *Krizovensky v. Krizovensky, supra* at 211, 624 A.2d at 642; *Walton v. Philadelphia Nat. Bank, supra* at 339, 545 A.2d at 1388. To determine if contractual terms are ambiguous, which is a question of law, the following factors must be considered: the words of the agreement; alternate meanings proposed by counsel; and extrinsic evidence offered in support of the proposed meanings. *Id.* (quoting *Kroblin Refrigerated Xpress, Inc. v. Pitterich*, 805 F.2d 96, 101 (3rd Cir.1986)). Additionally, provisions of a contract which appear to conflict "will be construed, if possible, as consistent with one another." *In re Trust of Binenstock*, 410 Pa. 425, 434, 190 A.2d 288, 293 (1963) (citing 3 Corbin, Contracts § 547 (3 ed. 1960)).

It is [a] well settled doctrine that a contract must be construed as a whole, and the intention of the parties is to be collected from the *entire* instrument and not from detached portions, it being necessary to consider all of its parts in order to determine the meaning of any particular part as well as of the whole. Individual clauses and particu-

lar words must be construed in connection with the rest of the agreement, and all parts of the writing, and every word of it, if possible, will be given effect. 13 C.J. § 486, p. 525, 17 C.J.S., Contracts, § 297; *Stewart's Administrators v. Lang*, 37 Pa. 201, 78 Am.Dec. 414; *Berridge v. Glassey*, 112 Pa. 442, 3 A. 583, 56 Am.Rep. 322; *McMillin v. Titus*, 222 Pa. 500, 72 A. 240; *Knickerbocker Trust Co. v. Ryan*, 227 Pa. 245, 75 A. 1073.

*Mowry v. McWherter*, 365 Pa. 232, 239–40, 74 A.2d 154, 158 (1950) (emphasis added).

Instantly, after reading the words of the PSA together with the words of the QDRO, considering the alternate meanings for those words proposed by appellant and appellee, and analyzing any extrinsic evidence which can be gleaned from the record, I conclude that the intent of appellant and appellee can be determined from the unambiguous language of the contractual provisions which the PSA and the QDRO combine to create. Appellant and appellee formed this contract to split their *marital* property in a manner that each of them deemed to be equitable. In both the PSA and the QDRO, appellant and appellee acknowledge that only the portion of appellant's pension benefits accumulated during their marriage constitutes marital property subject to division. Specifically, the PSA states that "[t]he parties acknowledge that [appellant] has acquired *during the marriage* a military pension." PSA at 14 (emphasis added). The QDRO states that "[a] *portion* of the Plan is *marital property* subject to distribution...." QDRO at 2 (emphasis added). Thus, the majority's conclusion that appellant and appellee contracted for the equal division of appellant's entire pension benefit is incorrect; the marital property distribution contract does not provide for such a division of the benefits.[1]

Appellant and appellee, in their February 8, 1987 marital property distribution contract, clearly intended to equally

---

1. By ignoring the language of the PSA and the QDRO pertaining to the marital portion of appellant's military pension, the majority fails to construe the entire contract as a whole, does not give effect to each of the provisions of the contract, and fails to consider these provisions in a manner consistent with one another.

divide only the marital portion of appellant's pension benefits when the pension entered pay status. The QDRO defines the marital portion of appellant's pension benefits to be "one-half (fifty percent) of the *projected* pay status gross monthly pension income. The *portion to be segregated* for [appellee] is fifty percent (50%) of [appellant's] full retirement benefits." QDRO at 2 (emphasis added). The word "projected" evidences appellant's and appellee's intent to divide only that portion of appellant's pension benefits which accumulated as of the date of the marital property distribution contract because that exact amount was unknown and had to be "projected" when the contract was executed. Moreover, the "portion to be segregated for appellee" is, in my opinion, the marital portion.

In light of the foregoing, I conclude that, after reading the provisions of the PSA and the QDRO together, the intent of appellant and appellee with regard to the division of appellant's pension was to equally divide only that portion of appellant's pension which had accrued as of February 8, 1987, the date of appellant's and appellee's contract to divide their marital property. Simply stated, that portion of appellant's pension which accrued after February 8, 1987 is not considered to be marital property in the contract and its division was not intended. Both the PSA and the QDRO impliedly or expressly recognize this fact. Appellant and appellee agreed to split the projected marital portion of appellant's full pension benefits equally, no matter what the date of appellant's retirement actually was. In the context of the entire property distribution agreement entered into by appellant and appellee and the consistent interpretation of all of its provisions, I would hold that appellee is entitled to an equal division of appellant's pension benefits accumulated as of February 8, 1987.[2]

2. By dividing appellant's entire military pension, including that portion of it which accrued after February 8, 1987, the majority not only contravenes the express intent of the parties as evidenced by the PSA and the QDRO, but it also inequitably allocates appellee's pension benefits that he earned after he and appellee effectively terminated their marital relationship. The majority has failed to cite any case law which would persuade me that this inequitable interpretation of the PSA and the QDRO is correct.

My interpretation of the contractual provisions contained in the PSA and the QDRO does not, however, automatically lead to appellant's conclusion that appellee is only entitled to one-half of a lieutenant colonel's pension benefits, *i.e.*, the pension benefits that appellant was entitled to receive if he had retired on the date of his and appellee's divorce. To aid me in my determination of the exact amount of appellant's pension benefits which constitutes marital property, I consider how the courts of this Commonwealth equitably distribute pension benefits between former spouses when a property settlement contract does not exist to be instructive. When a court orders the equitable distribution of pension benefits between former spouses, the increases in the value of the pension benefits attributable to the continued employment of the person actually accumulating the pension benefits is allocated to his or her former spouse. *Holland v. Holland*, 403 Pa.Super. 116, 118–19, 588 A.2d 58, 59–60 (1991), *allocatur denied*, 528 Pa. 611, 596 A.2d 158 (1991). This is justified by the fact that "the non-employed spouse [must] wait until some indefinite time in the future to receive the marital share." *Id.* at 118, 588 A.2d at 60. To determine the portion of a pension that constitutes marital property, a coverture fraction is calculated. *Lowry v. Lowry*, 375 Pa.Super. 382, 404, 544 A.2d 972, 983 (1988).

> The numerator of the fraction is the period of the employee-spouse's participation in the pension plan during marriage. The denominator is the total period of time the employee spouse was accruing benefits.

*Id.*

Instantly, appellant and appellee intended, via the PSA and the QDRO, to equally divide the marital portion of appellant's pension benefits. Hence, the marital portion of those benefits are calculated in the same manner that the equitable distribution of marital pension benefits is effectuated because I consider the aforementioned equitable distribution cases to control and best illustrate appellant's and appellee's expressed contractual intent. Consequently, the portion of appellant's pension benefits which is attributable to both his marriage to appellee and his service in the USAF must be calculated.

Appellant began his service in the USAF in August 1964, less than a year after he and appellee were married. Appellant and appellee effectively ended their marriage when they agreed to separate and divide their marital property on February 8, 1987. Appellant then retired from the USAF on September 1, 1992, approximately sixty-seven months after the execution of the February 8, 1987 contract. Thus, appellant and appellee lived as husband and wife for two hundred, sixty-nine of the three hundred, thirty-six months that appellant served in the USAF.

Appellee is entitled to the increase in the value of appellant's pension benefits resulting from his continued service in the USAF because appellant and appellee agreed to equally divide the marital portion of the pension benefits in the PSA and the QDRO. Moreover, to determine the marital portion of appellant's pension benefits, a coverture fraction must be calculated. The numerator of the coverture fraction is two hundred, sixty-nine (the number of months appellant and appellee were married while appellant served in the USAF); its denominator is three hundred, thirty-six (the total number of months appellant served in the USAF). Thus, pursuant to the parties' marital distribution contract, the portion of the military pension subject to distribution between the parties is the entire colonel's pension benefit multiplied by the coverture fraction of 269/336 or .80, the product of which shall then be divided by one-half.

Based upon the foregoing, I would reverse the determinations of the trial court and remand for the issuance of a revised qualified military retirement order which would comply with the directives contained herein.