CALVIN MOORE, PLAINTIFF-RESPONDENT, v. BARBARA MOORE, DEFENDANT-APPELLANT.

Argued November 7, 1988—Decided February 15, 1989.

148

150

*Ben J. Slavitt* argued the cause for appellant (*Slavitt, Fish & Cowen,* attorneys; *Ronald G. Schecter,* on the brief).

*Mitchell E. Ignatoff* argued the cause for respondent (*Tutela & McKinley,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

We hold today that the right to receive future post-retirement cost-of-living increases payable to pensioners under the New Jersey Police and Firemen's Retirement system (NJPFRS) qualifies as marital property subject to equitable distribution. The extent of inclusion of such post-retirement cost-of-living increases is limited to those attributable to the portion of the pension that was earned during the marriage.

Calvin Moore and Barbara Moore were married in December of 1961. Mr. Moore became a policeman in the City of Newark in March of 1963, which is when he enrolled in the New Jersey Police and Firemen's Retirement System. The Moores had two children.

The parties accumulated a number of assets during their marriage, including a nine-family rental property and a three-unit dwelling. They also acquired life insurance, bank accounts, and Mr. Moore's policeman's pension.

In August of 1979 Mr. Moore filed for divorce on the grounds of extreme cruelty. Mrs. Moore counter-claimed on the same grounds. The trial court rendered a Dual Judgment for Divorce. Under the judgment Mr. Moore was awarded the nine-unit property and Mrs. Moore the three-unit property. Mr. Moore was required to compensate Mrs. Moore for the difference in value between the properties. No distribution of the other assets was ordered in this judgment. The trial court, however, acknowledged that the parties agreed to divide these assets equally. Mrs. Moore was awarded custody of the two children, then ages twelve and eleven, and support and alimony; the latter consisted of payments of $30.00 per week running from August 1, 1980 to September 1, 1981.

In an order dated March 2, 1984, the trial court valued and distributed the remaining assets, including the pension. The pension was valued at $3,874.36, an amount equal to Mr. Moore's contributions to the plan during the parties' marriage.

Mrs. Moore appealed, and the Appellate Division held that in light of *DiPietro v. DiPietro,* 193 *N.J.Super.* 533 (App.Div. 1984), the amount of the pension subject to equitable distribution was not limited to the amounts Mr. Moore contributed to the system. Thus, it reversed and remanded for a "valuation of the value of the pension consistent with the principles expressed in *Dipietro.*"

On remand, the trial court and the parties referred to May 14, 1982, and May 18, 1982, expert valuation letters by Robert Davis, a consulting actuary. For purposes of his calculations Davis made assumptions regarding interest rates and mortality. He then calculated the discounted current value of the portion of the pension accruing from contributions made during the marriage of the parties. Davis stated that if Mr. Moore were to have retired after the parties' divorce but before completing twenty-five years of service, the pension would have three possible values: $21,974 without recognizing future salary or post-retirement cost-of-living increases; $47,441 recognizing fu-

ture salary increases but not future post-retirement cost-of-living increases; or $66,212 recognizing both future salary and post-retirement cost-of-living increases. Alternatively, Davis presented three additional figures to account for the possibility that Mr. Moore would complete twenty-five years of service and thereby receive a larger percentage of his average final compensation: $32,325 without recognition of future salary and post-retirement cost-of-living increases; $59,830 recognizing future salary increases but not future post-retirement cost-of-living increases; or $84,951 recognizing both future salary and post-retirement cost-of-living increases. The parties accepted the methodology and accuracy of Mr. Davis' reports.

The trial court accepted the Davis valuations and chose $59,830 as the value of the pension. The court determined that it would be too speculative to consider post-retirement cost-of-living increases since the Davis reports indicate they are not guaranteed by the retirement system but have been granted by the state outside of the system for the past ten years. Nevertheless, the trial court included future salary increases and accepted the calculation of Mr. Davis which recognized additional benefits flowing from Mr. Moore's completion of twenty-five years of service.[1] The trial court also ruled that "[b]ased on the history of this litigation it would be unfair to compel the plaintiff to pay one-half of $59,830 ($29,915) in a lump sum." Hence, the court allowed Mr. Moore to pay this sum over a period of time not to exceed twenty-four months. The court also held that the parties should pay their own counsel fees.

Mrs. Moore appealed on three grounds: (1) post-retirement cost-of-living increases should have been considered and the pension valued at $84,951; (2) Mr. Moore should have been

---

[1] The trial court was informed that Mr. Moore was just two years away from completing twenty-five years of service in 1986. The trial court, however, indicated the pension should be valued based on circumstances existing at the time the case was initially tried, that is, 1979–1980. Nevertheless, the court adopted the figure including these additional benefits.

required to pay her share of the pension's value immediately; and (3) she should have received counsel fees. There was no cross-appeal. The Appellate Division affirmed, holding there was adequate credible evidence in the record to support the trial court's valuation of the pension. Further, it stated that the ultimate award, the two-year pay out and the denial of counsel fees did not constitute an abuse of discretion.

On May 24, 1988, we granted certification on the first and second issues. 111 *N.J.* 581 (1988).

## I

In 1971 the Legislature enacted a law to "effectuate an equitable distribution of the property, both real and personal, which was legally and beneficially *acquired* " during the course of the marriage on its dissolution. *N.J.S.A.* 2A:34-23 (emphasis added.) A major policy consideration underlying the statute was

> to right what many have felt to be a grave wrong. It gives recognition to the essential supportive role played by the wife in the home, acknowledging that as homemaker, wife and mother she should clearly be entitled to a share of family assets accumulated during the marriage. Thus the division of property is responsive to the concept that marriage is a shared enterprise, a joint undertaking, that in many ways it is akin to a partnership.
>
> [*Rothman v. Rothman*, 65 *N.J.* 219, 229 (1974).]

This statute, however, does not address the issue before us.[2]

Likewise, no case in New Jersey explicitly addresses the question of whether post-retirement cost of living increases are to be included in equitable distribution awards. However, a plethora of New Jersey cases, relying on the public policy underlying the equitable distribution statute, have held that the right to receive benefits accruing to a spouse *subsequent* to a divorce are subject to equitable distribution if they are related to the joint efforts of the parties. *Whitfield v. Whitfield*, 222 *N.J.Super.* 36, 47 (App.Div.1987); *Amato v. Amato*, 180 *N.J.*

---

[2]The same is true of recent amendments to the equitable distribution law. *L.*1988, *c.* 153.

*Super.* 210, 219 (App.Div.1981); *Kikkert v. Kikkert,* 177 *N.J. Super.* 471, 475 (App.Div.1981), aff'd o.b., 88 *N.J.* 4 (1981); *Weir v. Weir,* 173 *N.J.Super.* 130, 133–34 (App.Div.1980); *McGrew v. McGrew,* 151 *N.J.Super.* 515, 518 (App.Div.1977); *Scherzer v. Scherzer,* 136 *N.J.Super.* 397, 401–02 (App.Div. 1975), *certif. den.,* 69 *N.J.* 391 (1976); *DiTolvo v. DiTolvo,* 131 *N.J.Super.* 72, 79 (App.Div.1974), *superseded on other grounds, Landwehr v. Landwehr,* 111 *N.J.* 491 (1988); *Blitt v. Blitt,* 139 *N.J.Super.* 213, 217–18 (Ch.1979).

In *Scherzer* the court held that future increases in the value of a husband's interest in a close corporation attributable to the efforts of either spouse during the marriage were eligible for equitable distribution. 136 *N.J.Super.* at 401. As noted in *Scherzer,* "[t]he theory is that a homemaker's contribution cannot be given a monetary worth and its value may be gleaned from the [efforts] of the employed spouse." [3] *Ibid. Accord Weir, supra,* 173 *N.J.Super.* at 133–34; *McGrew, supra,* 151 *N.J.Super.* at 518; *cf. Dugan v. Dugan,* 92 *N.J.* 423, 433 (1983) (corporate good will subject to equitable distribution); *Stern v. Stern,* 66 *N.J.* 340, 346 (1975) (good will and accounts receivable considered in arriving at equitable distribution); *Grayer v. Grayer,* 147 *N.J.Super.* 513, 521 (App.Div.1977) (same).

Similarly, *Amato, supra,* 180 *N.J.Super.* 210, and *DiTolvo, supra,* 131 *N.J.Super.* 720, also allowed a former spouse to share in future benefits accruing to the other spouse that were related to joint efforts during the marriage. Both cases held that portions of future personal injury recoveries were subject to equitable distribution on a deferred payment basis. *Amato, supra,* 180 *N.J.Super.* at 219; *DiTolvo, supra,* 131 *N.J.Super.* at 82. *Amato* did state that such a distribution should not reach personal losses, like pain and suffering, but should be limited to losses that diminished the marital estate, such as past

---

[3]The record indicates that Mrs. Moore did not work outside the home throughout most of the marriage.

wages and medical expenses. *Id.* at 219; *accord Landwehr, supra,* 111 *N.J.* at 502. Yet both cases acknowledge that an expectancy related to joint suffering by the parties during their marriage is subject to equitable distribution if and when it accrues.

The *Blitt* court came the closest to addressing the specific issues in the case at bar. Although the *Blitt* court decided to defer distribution of the non-employee spouse's share of a pension plan, it provided that the share set aside "shall participate in all gains and losses of the plan." 139 *N.J.Super.* at 219. Hence, arguably, *Blitt* implicitly supports the position that post-retirement cost-of-living increases are to be considered in determining equitable distribution awards.

In *Kikkert* the Appellate Division and this Court addressed the equitable distribution of pension benefits that could not be enjoyed unless and until the employee spouse lived another nine years and held such benefits were subject to equitable distribution. We reasoned that a pension plan asset "is the result of direct or indirect efforts expended by one or both parties to the marriage—it is additional compensation for services rendered for the employer and a right acquired during the marriage." *Kikkert, supra,* 177 *N.J.Super.* at 476. Further, we decided that "[e]ach spouse had the expectation of future enjoyment with the knowledge that the pensioner need only survive to receive it." *Id.* at 476–77. Thus, we have approved of the inclusion of a future, contingent pension benefit in an equitable distribution award.

Similar to *Kikkert,* the Appellate Division in *Whitfield, supra,* 222 *N.J.Super.* 36, ruled that a non-employee spouse could receive an equitable distribution award of pension benefits that her former husband would not be eligible to receive unless and until he served for four additional years after their separation and divorce. The *Whitfield* court stated that "[t]he includibility of property in the marital estate does not depend on when, during the marriage, the acquisition took place ... [but] de-

pends on the nature of the interest and how it was earned." *Id.* at 47. *Contra Barba v. Barba,* 198 *N.J.Super.* 205, 212 (App. Div.1985); *White v. White,* 136 *N.J.Super.* 552, 554 (App.Div. 1975); *Mueller v. Mueller,* 166 *N.J.Super.* 557, 561 (Ch. 1979). These cases held that retirement benefits to which the employee spouse had not become entitled during the course of the marriage were future expectancies and hence not to be included in equitable distribution awards. To the extent *White, Barba,* and *Mueller* stand for the proposition that any future pension benefit is not subject to equitable distribution, they are overruled.

In this case Mr. Moore's post-retirement cost-of-living increases were paid by the government and are unrelated to his future personal efforts. They are similarly unrelated to Mrs. Moore's future efforts. However, although these increases are not attributable to future efforts, they are attributable to past contributions and service. There would be no post-retirement cost-of-living increases without the latter. The portion of contributions and services to the plan made by Mr. Moore during the marriage relate to the joint efforts of both parties. Therefore, the segment of cost-of-living increases attributable to those contributions and services made during the marriage from the joint efforts of both parties are subject to equitable distribution.

In many American families a major asset is the wage earner's pension. Both marriage partners rely on the pension to provide them with security for their future. In *Kruger v. Kruger,* 73 *N.J.* 464, 468 (1977) *superseded on other grounds, Landwehr, supra,* 111 *N.J.* 491, we held that "the right to receive monies in the future is unquestionably ... an economic resource" subject to equitable distribution. Here Mr. Moore earned the major portion of his pension during the "shared enterprise" of his marriage. Consequently, "[f]airness ... entitle[s] both him and his wife to their respective shares." *Kikkert v. Kikkert, supra,* 88 *N.J.* at 8 (Pashman, J. concurring).

We conclude therefore that future benefits such as post-retirement cost of living increases under the NJPFRS are "property" subject to equitable distribution. The fact that these benefits become due and owing subsequent to the divorce does not immunize them from equitable distribution. The majority of cases from outside this jurisdiction are in accord with this view.[4] *Lentz v. Lentz*, 353 *N.W.*2d 742, 747 (N.D.1984); *Cave and Cave*, 85 *Or.App.* 336, 338, 736 *P.*2d 215, 216 (1987); *Manners and Manners*, 68 *Or.App.* 896, 899, 683 *P.*2d 134, 136 (1984); *Sprott v. Sprott*, 576 *S.W.*2d 653, 655–56 (Tex.Civ.App. 1978). *Contra Dunn v. Dunn*, 703 *S.W.*2d 317, 321 (Tex.Ct. App.1985) ("To do so would invade the separate estate of the working spouse.").

## II

■ In this case the trial court held that post retirement cost-of-living increases were not "property" subject to equitable distribution because they were too speculative. The uncertainties and contingencies inherent in such future benefits are issues that go to *how* and *when* such benefits are to be equitably distributed, not to *whether* they should be distributed. Regardless of the speculative nature of future post-retirement

---

[4]Authorities from other states also clash with the trial court's decision to consider future salary increases in its current valuation of respondent's pension. *See Petschel v. Petschel*, 406 *N.W.*2d 604, 607 (Minn.Ct.App.1987); *Berry v. Berry*, 647 *S.W.*2d 945, 947 (Tex.1983). There is no cross-petition in this case. Thus, we do not reach this issue. However, we do note that the *Petschel* Court nevertheless awarded the non-working spouse a deferred distribution award of future cost-of-living increases because these, unlike future salary increases, do not result from the personal, individual efforts of the employee spouse. *Id.* at 607. Similarly, several courts in other states have included future cost-of-living increases in current valuations while excluding consideration of future salary increases. *Koelsch v. Koelsch*, 148 *Ariz.* 176, 185, 713 *P.*2d 1234, 1243 (1986); *In re Marriage of Castle*, 180 *Cal.App.*3d 206, 216, 225 *Cal.Rptr.* 382, 388 (1986); *In re Marriage of Jacobson*, 161 *Cal.App.*3d 465, 474, 207 *Cal.Rptr.* 512, 518 (1984); *In re Marriage of Scott*, 156 *Cal.App.*3d 251, 254, 202 *Cal.Rptr.* 716, 718, *cert. den.*, 469 *U.S.* 1035, 105 *S.Ct.* 508, 83 *L.Ed.*2d 399 (1984).

cost-of-living benefits they are not immune from equitable distribution.

For example, in equitable distribution cases not involving pensions New Jersey courts have actually included future unaccrued benefits in present value calculations. *Dugan, supra,* 92 *N.J.* at 433; *Stern, supra,* 66 *N.J.* at 346; *Grayer, supra,* 147 *N.J.Super.* at 521. In *Stern* we held that future benefits accruing to a husband's partnership flowing from its good will as well as accounts receivable were to be "examined and valued ... to be included in determining the entire worth of defendant's partnership interest ... [which should then be] allocated between the parties." *Stern, supra,* 66 *N.J.* at 346–47. Although the future benefits of good will and the value of accounts receivable are, like Mr. Moore's future cost of living increases, difficult to measure and contingent in nature, in *Stern* we stated that "the concept of vesting should probably find no significant place in the developing law of equitable distribution." 66 *N.J.* at 348.

■ Generally there are two ways that trial courts have equitably divided an employee-spouse's future post-retirement cost-of-living increases—the "deferred distribution" method or the "immediate offset or payment" method. *Kikkert v. Kikkert, supra,* 177 *N.J.Super.* at 477–78; *accord Lowry v. Lowry,* 375 *Pa.Super.* 382, 544 *A.*2d 972 (1988). Both methods have advantages and disadvantages. Under the "deferred distribution" method the non-employee spouse does not receive any benefit until the benefits are actually paid to the employee spouse. Hence the major advantage of the "deferred distribution" method is that it eliminates any uncertainty or speculation about the value or benefit and avoids the necessity of fixing a present value for the future benefit.

The goal of divorce proceedings is to eliminate possible contact and strife between the parties. Thus, the major disadvantage of the "deferred distribution" approach is that it does not result in a final resolution. Under the "deferred distribu-

tion" approach the parties, the court, and the employer of the pensioner may continue to be embroiled in controversy. On actual receipt of the benefits by the pensioner a determination of the proper percentage of each pension payment to be distributed to the non-employee spouse must be made. The non-employee spouse must keep contact with the employee spouse to determine the official date of retirement. Additionally, the non-employee spouse will have to be constantly vigilant to ensure that proper revised beneficiary forms are filed with the employer and that agreed proper benefits are chosen at retirement. For instance, if the employee spouse remarries and changes the beneficiary of the plan, his new wife may receive the benefit.

The "present payout" method avoids the enforcement problems inherent in compelling the employee spouse to turn over part of the pension check to the non-employee spouse. This method eliminates any future contact between the parties, the court, or the employer with respect to the non-employee's future cost-of-living increases. Its major drawback, however, flows from the difficulty inherent in fixing a present value for future benefits. Furthermore, in some cases the employee-spouse will be financially burdened if forced to pay a lump sum present-value share. The employee-spouse's major asset may be the pension.

We recognize there is some controversy over whether the current valuation method should be employed without the consent of both parties when a conditional or contingent pension benefit is involved. *Whitfield, supra,* 222 *N.J.Super.* at 50. The *Whitfield* court stated that "[s]uch a payment may surely be made voluntarily, but not under the duress of a court order." *Ibid. Whitfield* conflicts with *Kikkert, supra,* 177 *N.J.Super.* 471, which was affirmed by this Court. In the latter case it was held that "[w]here the Court is satisfied, based upon appropriate proofs, that present value has been established ... a firm and final division may be achieved. ..."

177 *N.J.Super.* at 477. Thus, *Kikkert* leaves it to the court, not the parties, to decide on the method of distribution. It also states that current valuation "is to be encouraged." *Ibid.* This seems to be the more sensible approach. The present payout method is final, equitable, and immediately resolves the controversy.

We recognize that this method, while preferred, is not the only way in which an equitable share of a future contingent benefit could ever be awarded. Indeed, in addition to the deferred distribution method, in situations in which the future contingent benefit is not very likely to accrue, a form of partial deferred distribution could be employed.

The "partial deferred distribution" approach would entail a current valuation award of the appropriate share of the non-contingent portion of the pension and a deferred distribution of the share of the contingent benefits if and when they are paid to the employee spouse. The "partial deferred distribution" award is supported by some precedent. *Koelsch, supra,* 148 *Ariz.* at 185, 713 *P.*2d at 1243 ("We wish to leave open to the trial court's discretion the option, under very limited circumstances, of deferring ... part of the monthly payment owed to the non-employee spouse."); *cf. Staver v. Staver,* 217 *N.J.Super.* 541, 545 (Ch.1987) (portion of pension not included in current valuation equitable distribution may be considered in award of alimony). This method of distribution would allow the non-employee spouse immediate enjoyment of part of his or her equitable distribution award and yet effectively protect his or her right to share future contingent benefits.

Nonetheless, there are flaws in the "partial deferred distribution" approach. Contrary to the precepts of *Kikkert, supra,* 177 *N.J.Super.* at 477, this method would prolong relations between the parties. Also, it would continue judicial involvement in their affairs—calculations of the percentages of actual payments owed to petitioner would have to be made, disputes would arise, and so on. Hence, the "partial deferred distribu-

tion" method should be used only where the future benefit is extremely contingent *or* the parties have agreed to the employment of such an alternative.

■ Accordingly, we encourage use of the "immediate payment" approach. We recognize, however, that in some instances the "deferred distribution" or "partial deferred distribution" approach will be appropriate. Courts must decide which to use based on sometimes competing considerations: the elimination of strife between the parties, the ease with which the present value of the pension may be ascertained, and the ability of the employee spouse to pay the non-employee the current cash value of the pension.

### III

■ In determining the proper method of distribution in this case we must decide whether future cost-of-living increases under NJPFRS are so speculative as to make it impossible to calculate their present value so as to provide for their immediate payout.

The mere fact that a benefit is contingent and difficult to measure does not mean it is immune from equitable distribution. Indeed, considering (that is, making assumptions about) life expectancy and interest rates, as the actuary Davis did, also involves speculation. As one commentator arguing for the inclusion of future post-retirement cost-of-living increases under the NJPFRS in current valuation equitable distribution awards stated, *"[n]aturally, none of us know[s] the future course of cost of living anymore than we know the future course of interest rates—it is necessary to make an assumption."* Garfield, *Re: DiPietro case,* 111 *N.J.L.J.* 304 (1983) (emphasis supplied).

Moreover, courts are not blocked from employing the present payout approach simply because a contingent pension benefit may never accrue. Authorities have intimated that an alternative approach would entail discounting future contingent bene-

fits to account for this possibility. *Whitfield, supra,* 222 *N.J.Super.* at 47 ("[T]he conditional nature of a nonvested pension is clearly a legitimate area of inquiry on issues of valuation and distribution."); *McGrew, supra,* 151 *N.J.Super.* at 518 ("[T]he uncertainty of enjoying benefits may be a factor to be considered in awarding equitable distribution."); *Lowry, supra,* 375 *Pa.Super.* 382, 404, 544 *A.*2d 972, 983 ("If the pension [benefit] is not yet fully vested and immediate offset method of distribution is nevertheless used, a further discount to reflect the contingencies attendant on vesting is applied."); Buonocore, *Equitable Distribution of Defined Benefit Pension Rights,* (Pt. 2), 112 *N.J.L.J.* 669, 679 (1983) (contingency is proper factor in valuation of the asset).

Bearing these principles in mind we do not find that the increases under NJPFRS are so speculative as to preclude present valuation for immediate payout purposes. The Davis report indicates that such increases are contingent on state appropriation. As the trial court acknowledged, Davis stated that "[f]uture post retirement cost of living increases are *not* guaranteed by the retirement system but have been granted by the State outside of the retirement system for approximately the last 10 years." We take judicial notice that funding for these increases has been provided by the State each year subsequent to Davis' report.

The *Retired Public Employees' Pension Increase Act, N.J.S. A.* 43:3B–1 to –10 amplifies and supports Davis' observation. *N.J.S.A.* 43:3B–4 states that the employer of a specific pensioner (e.g., the city employing a particular policeman) is responsible for funding post-retirement cost-of-living increases. However, it also provides that in seeking such funds from the localities the Director of the Division of Pensions shall take into account certain variables: payments made by the employer and payments to be made to former employees of that employer. Further, it indicates that the remaining costs of these increases is to be covered by expenditures from the Director of the Division of Budget and Accounting at the request of the

Director of the Division of Pensions. So, the Act mandates that these increases are related to funding from both the employers and the State. We take judicial notice that the fund covering a specific locality's employees also covers state employees. The State pays the fund for cost-of-living increases for its employees and the localities *must* pay for increases for their employees. The localities finance a portion of the administrative expenses of the cost-of-living adjustments for their employees and the State pays the remainder of these expenses.[5]

Davis, therefore, correctly stated that such increases will not be paid if the State ceases to finance its share of the cost of them. *N.J.S.A.* 43:3B–5 provides that *all* post-retirement cost-of-living increases shall cease to be paid should the State fail to appropriate the amounts requested by the Director of the Division of Pensions.

Out-of-state courts have ruled with virtual unanimity that future post-retirement cost of living increases should be included in present value calculations of pensions. *Lowry, supra,* 375 *Pa.Super.* at 401, 544 *A.*2d at 982 ("[T]he appropriateness of using an inflation factor [to offset interest discounts] is completely dependent on the terms of the individual pension at issue."); *accord Koelsch, supra,* 148 *Ariz.* at 185, 713 *P.*2d at 1243; *Castle, supra,* 180 *Cal.App.*3d at 216, 225 *Cal.Rptr.* at 388; *Jacobson, supra,* 161 *Cal.App.*3d at 474, 207 *Cal.Rptr.* at 518; *Scott, supra,* 156 *Cal.App.*3d at 254, 202 *Cal.Rptr.* at 718; *In re Marriage of Sheldon,* 124 *Cal.App.*3d 371, 381, 177 *Cal.Rptr.* 380, 385 (1981), app. dismissed, 456 *U.S.* 941, 102 *S.Ct.* 2002, 72 *L.Ed.*2d 462 (1982); *Phipps and Phipps,* 75 *Or.App.* 757, 758, 707 *P.*2d 1287, 1288 (1985), *withdrawing opinion in,* 73 *Or.App.* 100, 698 *P.*2d 52 (1985); *see also* DiFranza & Parkyn, *Dividing Pensions on Marital Dissolu-*

---

[5]This is substantiated by the legislative history of the Act, which anticipates shared financing of these cost of living increases. *Fiscal Note to Assembly No. 3278,* L.1975 c. 375, and *Fiscal Note to Assembly No. 3515,* L.1977 c. 306.

*tion,* 55 *Cal.St.B.J.* 464, 466 (1980) (If a plan calls for cost-of-living increases a lower discount rate is appropriate to reflect the plan's compensation for inflation.). *Contra Daffin v. Daffin,* 567 *S.W.*2d 672, 680 (Mo.Ct.App.1978) ("[P]ension benefit, by its terms, varies according to the cost of living and ... such adjustable asset is most aptly allocable on a percentile basis.").

So too, the trial court here should have awarded Mrs. Moore a current valuation equitable award of these benefits discounted to compensate Mr. Moore for any uncertainty inherent in his receipt of these benefits. The trial court apparently thought that Mr. Moore possessed resources which were sufficient to warrant use of the current valuation form of distribution.[6] This is supported by the record, since, as noted, Mr. Moore is the owner of a nine-unit dwelling and gainfully employed. Also, as shown, the possibility of Mr. Moore not receiving cost-of-living increases is fairly remote, since they have been granted each and every year. One New Jersey case states that if a "court believes that the risks of total forfeiture of the ... rights are so remote ... [then it is] appropriate to fix a present value and distribute a portion thereof to the nonpensioner spouse." *Weir, supra,* 173 *N.J.Super.* at 135. We do not find the variability of the cost-of-living to be a bar to present valuation of such increases. The difficulty inherent in placing a present value on a future benefit does not bar a court from including that benefit as a current valuation. *Stern, supra,* 66 *N.J.* at 346; *Re: DiPietro, supra,* 111 *N.J.L.J.* 304.

The only disadvantage of this approach is the potential unfairness to Mr. Moore. However, in this case the risk of Mr.

---

[6] As noted, the trial court did grant Mr. Moore two years in which to pay this share to Mrs. Moore. Yet this was not, strictly speaking, a form of deferred distribution. This aspect of the trial court's decision will be discussed later in this opinion. For now it should be noted that such a step is a sensible one. It mitigates the harshness to the employee spouse of the "current valuation distribution" method.

Moore not receiving the cost-of-living increases is slight. More-over, as shown, authorities support discounting the current value of these benefits to reflect this uncertainty and eliminate unfairness.[7] Thus, if the trial court was concerned about unfairness to Mr. Moore it could have reduced the present value of the future cost-of-living increases to account for any uncer-tainty.[8]

We emphasize that the post-retirement cost-of-living increases that are subject to equitable distribution are limited to increases attributable to the pension earned during the marriage. Post-retirement cost-of-living increases attributable to that portion of the pension earned after the marriage are not subject to equitable distribution. To determine the post-retire-ment cost-of-living increases subject to equitable distribution we apply what some courts refer to as the "coverture fraction." *Lowry, supra,* 375 *Pa.Super.* at 404, 544 *A.*2d at 983. The numerator of this fraction is the total period of time that the employee-spouse participated in the plan during his marriage. The denominator is the total period of time that the employee spouse participated in the plan. *Whitfield v. Whitfield, supra,* 222 *N.J.Super.* at 48. The fraction is then applied to post-re-tirement cost-of-living increases to determine the percentage of those increases that are attributable to the employee spouse's participation in the pension.

---

[7] The trial court only awarded alimony payments of one year to Mrs. Moore. Mr. Moore's cost-of-living increases will not be paid until two years after retirement. However, in cases where alimony payments are still due at the time a cost-of-living increase included in a current valuation has failed to be paid, adjustments in alimony payments could be employed to do equity. This is, however, only appropriate where no discount to reflect that contingency has been made to reduce the current value of the pension. That is to say, it is an alternative method of distribution.

[8] The record does not indicate that Davis' valuation figures reflected such a discounting. Davis merely discounted to present value based on assumptions about future interest rates. Nevertheless, it is apparent that such a discount was probably unnecessary in this case.

## IV

We now address the second ground on which Mrs. Moore appeals—the trial court's decision to allow Mr. Moore two years to pay out her equitable share of his pension benefits. As noted, a good way to mitigate the harshness to the employee spouse involved in a current valuation distribution is to give him or her an opportunity to make payments over a short period of time. This seems consistent with *Kikkert, supra,* which states that deferred distribution should be employed "where other assets for equitable distribution are inadequate or lacking altogether." 177 *N.J.Super.* at 471. *Accord DiPietro, supra,* 193 *N.J.Super.* at 537. The trial court in the instant case did not defer distribution in a strict sense. Yet it seems to have allowed Mr. Moore two years to pay because resources were lacking and thus its decision is a defensible one.

However, we caution that the period of time in which to allow payment of the current valuation share must be short. If it is not, the coherency of discounting to present value based on assumptions about future interest rates will be undermined. *See Whitfield, supra,* 222 *N.J.Super.* at 51 ("[I]f distribution is deferred until [the pension is paid] discounting is unnecessary."). In any event, the issue of the two-year deferral has become moot, because over two years have elapsed since the time of the trial court's decision. Moreover, at oral argument both counsel agreed that there should be a current distribution, that Mr. Davis' valuations are correct, and that Mrs. Moore should receive 50% of the present value of Mr. Moore's pension benefits.

Therefore, we reverse and order Mr. Moore immediately to pay Mrs. Moore $12,561, the difference between the award she received from the trial court, $29,915 (50% of $59,830), and the amount she would have received had the trial court included post-retirement cost-of-living increases in his current valuation, $42,476 (50% of $84,951).

168

*For reversal*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN and STEIN—6.

Justice CLIFFORD did not participate.

*Opposed* —None.