919 A.2d 852 (2007)
392 N.J. Super. 1
Jennifer LARRISON, Plaintiff-Respondent,
v.
Richard Larrison, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Telephonically argued January 26, 2007.
Decided April 5, 2007.
*855 Timothy F. McGoughran, argued the cause for appellant (Lucas & McGoughran attorneys; Mr. McGoughran and Stephanie Cañas Hunnell, Belmar, on the brief).
Victoria L. Rehrer, Brick, argued the cause for respondent (Rehrer & Rehrer, attorneys; Ms. Rehrer, on the brief).
Before Judges CUFF,[1] FUENTES and BAXTER.
The opinion of the court was delivered by
FUENTES, J.A.D.
The principal issue we are required to determine in this appeal is whether a police disability pension is subject to equitable distribution without any exemption for that portion of the pension benefit intended as compensation for the disability. Defendant also argues that the Family Part erred in declining to impute a reasonable income to plaintiff, thereby improperly increasing his child support obligation; and in ordering him to obtain and maintain life insurance in plaintiff's favor in the amount of $275,000, as a means of protecting plaintiff's equitable distribution interest in his pension benefits.
After carefully considering the record before us, and in light of prevailing legal standards, we agree with defendant's position and reverse. We now reaffirm the principle we first articulated in Avallone v. Avallone, 275 N.J.Super. 575, 646 A.2d 1121 (App.Div.1994). In addressing an equitable distribution claim against a disability pension, a reviewing court must determine "which [portion of the pension] represents a retirement component in which plaintiff would be entitled to share, and that portion which represents compensation for defendant's personal disability and personal economic loss." Id. at 584, 646 A.2d 1121.
Here, the trial court failed to conduct the analysis necessary to make this determination. We thus vacate that portion of the final judgment of divorce ("JOD") that subjected defendant's disability pension to equitable distribution. We also vacate the section of the JOD that set the amount of defendant's child support obligation and required defendant to maintain a life insurance policy in the amount of $275,000. We remand these issues to the Family Part for further proceedings consistent with this opinion.
We gather the following facts from the evidence presented at trial.

I
Defendant began working as a police officer for the Neptune Township Police Department on February 1, 1996. The parties were married on November 19, 1997. They had two children, both girls, who are now ages eight and five. The family resided in a single family dwelling in Forked River, Ocean County.
On May 1, 2004, defendant retired after becoming eligible for a monthly ordinary disability pension benefit from the New Jersey Police & Firemen's Retirement System (PFRS). At the time of his retirement, defendant's base annual salary was $81,997.83. On October 8, 2004, defendant received a net retroactive pension check of $8,905.55, and thereafter began receiving a regular monthly retirement benefit of $2,733.26, which represented forty percent of his final year's salary.[2]
*856 On January 4, 2005, plaintiff filed for divorce. After preliminary negotiations, the trial court ordered the following pendente lite relief:
a. Defendant to pay $186 per week in child support through Ocean County Probation, effective June 15, 2005;
b. Defendant to continue to pay roof expenses for the marital home;
c. Defendant to continue to pay [youngest daughter's] pre-school tuition of $150.00 per month;
d. Sale of the marital home to be considered a change in circumstances concerning support;
e. Finding Defendant to have ability to pay more than $600 per month in support.
The marital residence was sold on July 28, 2005, for $245,000. The net proceeds from the sale were divided equally between the parties. At the time of trial, defendant was employed full-time by the Township of Lacey Public Works Department, and was earning $30,638.40, or $14.73 per hour. The parties agreed to share joint legal custody of their two children, with plaintiff as the "parent of primary residence." Defendant had parenting time with the girls "every other weekend from Friday through Sunday, every Thursday for dinner and the Monday for dinner during the week following the weekend he does not have the children." Defendant was also responsible for providing the children with medical and dental insurance coverage; and agreed to "provide [p]laintiff with information necessary for her to obtain COBRA benefits available to her through his employment."

II
The case was tried over a five-day period before the Family Part. Each party presented expert testimony in the area of pension evaluation. Both sides stipulated to the experts' qualifications, and to their capability to offer opinion testimony on this issue.

A

Plaintiff's Expert
William Troyan testified for plaintiff, and authored a report dated August 1, 2005, regarding defendant's pension. Troyan began his analysis by dividing the total period of time the parties were married while defendant was accruing a benefit, by the total period of service of defendant. Through this approach, he calculated that the marital coverture fraction, or the portion of the benefit attributable to the marriage, was 78.18%.
Based on a letter prepared by Peter J. Gorman, Executive Assistant, State of New Jersey, Department of Treasury, Division of Benefits and Pension, Troyan opined that defendant's pension was a "regular monthly retirement allowance" that contained no specific allocation for lost wages due to disability, and was therefore subject to equitable distribution.
Troyan acknowledged, however, that Gorman also referred to defendant's pension as an "ordinary disability retirement." He further recognized that, at the time of his retirement, defendant was not qualified for any pension other than the disability pension. Specifically, he stated that if defendant had retired at the same time without a disability, he would have only received a "refund of his contributions," which totaled $35,430.41.
*857 Finally, Troyan specifically noted that despite his characterization of defendant's pension as a marital asset, subject to equitable distribution, plaintiff would not be entitled to a survivor benefit if the parties were divorced. He therefore suggested the use of an insurance policy as a means of protecting plaintiff's share of defendant's pension. In determining the present value of defendant's pension, Troyan used a gender-neutral mortality table, and did not take into account any disability or abbreviated life expectancy. He concluded that the total value of defendant's pension, for equitable distribution purposes, was $536,406.67.

B

Defendant's Expert
Kimberly Garrison testified on behalf of defendant, and authored her own report dated June 15, 2005, regarding defendant's pension. Although she acknowledged that defendant was currently receiving $2,733.26 per month, Garrison calculated an assumed monthly benefit of $1,127.32, based on a deferred pension. As she explained: "If he had terminated his job and waited until he was 55 and never [became] disabled in the first place, this was the amount of money to which he would have been entitled." According to Garrison, if a police officer retires at age fifty-five, but without ten years of service, he receives a pension based on the formula of "two percent times your years [of service] times your salary."
Applying this formula to defendant's case, Garrison made the following calculations: 0.02 x 8.25 (defendant's years of service) × $81,987 = $13,527.86 (annual benefit). She then divided $13,527.86 by 12 months, which resulted in a monthly benefit of $1,127.32. She determined defendant's mortality, using a gender-specific mortality table, and taking into account defendant's disability. Using the monthly benefit to determine the amount of benefits defendant would receive in his lifetime (based on a mortality table) commencing at age 55, Garrison concluded that the present value of defendant's benefits was $77,210.44.
She then reduced this value by multiplying it by 0.8250, which represented "a reduction for the probability of service to 100 percent vesting as equal to the portion already completed," and 0.7819, which represented "that portion of the value of the benefits attributable to the marriage." As a result, Garrison concluded that the valuation for equitable distribution, as of January 4, 2005, the date of the complaint, was $49,805.95.[3]
To determine plaintiff's monthly benefit, Garrison assumed that the parties would share the value of the equitable distribution equally, resulting in $24,902.98 to each party. She then spread this benefit out over defendant's presumed lifetime, and included cost of living increases over the years, which resulted in a monthly payment to plaintiff of $90.49.
Garrison admitted that the pension plan does not provide for the remedy she recommended. She also noted, however, that the plan does not provide a procedure for splitting up a pension upon divorce. In this light, she argued that her recommendation was "a reasonable way to come up with a way to give parties a value if they are trying to trade assets."
Despite defendant's legal position to the contrary, Garrison admitted that no portion *858 of the benefit was specifically allocated for disability or lost wage replacement. She argued, however, that the pension must be for disability, because if defendant had left his job for any other reason at that time, he would only receive a refund of his contributions.
Thus, she contended:
The fact that he's getting money today at age 36  he's around that age  from now until 55, I don't know any other way to characterize it. Why would the State deem it's okay to start paying him over $1,000 more now, from now until he's 55, if it's not a form of compensation?
Although her report did not consider payment to plaintiff after defendant's lifetime, Garrison acknowledged that life insurance would be one way to protect her portion of the pension. Finally, she characterized the term "regular monthly retirement allowance," in the letter from the Department of Treasury, Division of Benefits and Pension, as simply referring to the fact that defendant was going to receive the payment every month, and did not indicate that he was receiving a regular pension as opposed to a disability pension.

C

Trial Court's Witness
Peter J. Gorman, Executive Assistant, State of New Jersey, Department of Treasury, Division of Benefits and Pension, testified at the request of the trial court. As noted earlier, Gorman had written a letter on August 2, 2005, in which he stated that defendant's "application for ordinary disability retirement with an effective retirement date of May 1, 2004, was approved by the Board of Trustees of the Police and Firemen's Retirement System (PFRS) with an approved, regular monthly retirement allowance of $2,733.26."
In his testimony before the trial court, Gorman testified that defendant's benefit is "a retirement benefit, but in order to qualify for that retirement benefit, you at least in this system have to have five years of service in and be declared to be totally and permanently disabled to such a degree that you can't do your police or firemen's job." (Emphasis added.) He emphasized, however, that this disability retirement plan is the same as the other plans, in that they "don't assign so much of the retirement benefit for lost wages or pain and suffering." In other words, although "the qualifications and the amounts [of the various plans] are different, . . . they're all avenues to receiving a retirement benefit."
With respect to defendant's disability pension, Gorman noted that, at least in part, the benefits paid are intended to replace lost wages. Specifically he stated:
I think it was an attempt to substitute and say, okay, disability is always unexpected; you were making [$]83,000; you shouldn't be penalized if you decide to go out up to that [$]83,000 or whatever the increases are. But if you go beyond it, you're, in effect, profiting, quote/unquote.
It is clear, however, that from the perspective of the Division of Pensions, "the benefit is not broken down by lost wages, pain and suffering."

III
The trial court articulated its findings and conclusions in an oral opinion delivered from the bench. With respect to the issue of defendant's pension, the court held that "defendant's pension is and will continue to be a monthly retirement benefit . . . and not a replacement for lost wages." The court found that "defendant has failed to provide the Court with any evidence that any of the marital coverture portion of *859 his retirement benefit is exempt from equitable distribution." As a direct result of this finding, the trial court determined that:
[T]he marital coverture portion of the defendant's pension is subject to equitable distribution. A pension is an asset that may only be contributed to by one party but is a result of the marital [unit's] efforts to provide financial security in the future. The plaintiff is entitled to share in the pension benefits that accumulated during the marriage, as they are subject to equitable distribution. The distribution should commence from the date the defendant became eligible to receive the benefits.
In the course of reaching this decision, the court rejected defendant's argument based on Avallone. The court further discounted defendant's expert's testimony as "not credible," primarily because she based her report on a deferred retirement "when, in fact, it is clear that the defendant was approved for an ordinary disability pension." Conversely, the court found plaintiff's expert's report and testimony "to be highly credible and properly based upon Peter Gorman's August 2, 2005 letter and his later testimony."

IV

Defendant's Disability Pension
We will now address defendant's argument challenging the court's ruling with respect to his pension benefits. The party seeking exemption from equitable distribution bears the burden of proof. Landwehr v. Landwehr, 111 N.J. 491, 504, 545 A.2d 738 (1988). Ordinarily, the "portion of a pension legally or beneficially acquired by either party during marital coverture is subject to equitable distribution." Claffey v. Claffey, 360 N.J.Super. 240, 255, 822 A.2d 630 (App.Div.2003) (citing Kikkert v. Kikkert, 88 N.J. 4, 5, 438 A.2d 317 (1981)).
The coverture fraction represents the number of years during coverture that the pensioner spouse was a member of the pension plan, divided by the total number of years that the pensioner spouse was a member of that pension plan. The resulting coverture fraction represents that portion of the pension that is subject to equitable distribution.
[Id. at 256, 822 A.2d 630.]
N.J.S.A. 2A:34-23b requires a trial court to make thirteen individual findings in determining the question of equitable distribution.
(1) The actual need and ability of the parties to pay;
(2) The duration of the marriage or civil union;
(3) The age, physical and emotional health of the parties;
(4) The standard of living established in the marriage or civil union and the likelihood that each party can maintain a reasonably comparable standard of living;
(5) The earning capacities, educational levels, vocational skills, and employability of the parties;
(6) The length of absence from the job market of the party seeking maintenance;
(7) The parental responsibilities for the children;
(8) The time and expense necessary to acquire sufficient education or training to enable the party seeking maintenance to find appropriate employment, the availability of the training and employment, and the opportunity for future acquisitions of capital assets and income;
(9) The history of the financial or non-financial contributions to the marriage or civil union by each party including *860 contributions to the care and education of the children and interruption of personal careers or educational opportunities;
(10) The equitable distribution of property ordered and any payouts on equitable distribution, directly or indirectly, out of current income, to the extent this consideration is reasonable, just and fair;
(11) The income available to either party through investment of any assets held by that party;
(12) The tax treatment and consequences to both parties of any alimony award, including the designation of all or a portion of the payment as a non-taxable payment; and
(13) Any other factors which the court may deem relevant.
As we described in Claffey, there are generally three methods of calculating a spouse's interest in a pension plan: (1) a present-value offset distribution; (2) a deferred-distribution; and (3) a partial deferred-distribution award. Claffey, supra, 360 N.J.Super. at 255, 822 A.2d 630. First, when applying the present-value offset distribution method, the court must determine the present value of future benefits. Ibid.
Use of that valuation method involves calculations based upon the assumption that the pensioner spouse terminated his or her participation in the pension plan as of the date of filing of the complaint for divorce, and further assumptions of the final average salary of the pensioner, the date at which the pensioner will retire, and various assumed interest rates, mortality tables, cost-of-living adjustments and other factors to determine the present value of annuities for the type of plan being valued.
[Ibid.]
Notably, the present-value offset distribution method "is only to be used `when there are sufficient other marital assets against which to offset the non-pensioner's equitable distribution interest in the pension, or sufficient income available to facilitate a reasonable buy-out of the non-pensioner spouse's interest.'" Menake v. Menake, 348 N.J.Super. 442, 448, 792 A.2d 448 (App.Div.2002) (quoting Risoldi v. Risoldi, 320 N.J.Super. 524, 539, 727 A.2d 1038 (1999)).
Second, if the court uses a deferred-distribution method, the court must base the interest calculation on the coverture fraction. Claffey, supra, 360 N.J.Super. at 256, 822 A.2d 630. Then the court must determine the non-pensioner spouse's equitable interest in the coverture fraction, and enter an order distributing the interest at the time of the retirement of the pensioner spouse. Ibid.
Finally, the court can employ the partial deferred-distribution method, which entails "`a current valuation award of the appropriate share of the non-contingent portion of a pension and a deferred distribution of the share of the contingent benefits if and when they are paid to the employee spouse.'" Id. at 257, 822 A.2d 630 (quoting Moore v. Moore, 114 N.J. 147, 151, 553 A.2d 20 (1989)). This method allows the non-pensioner spouse to receive a share of the pension immediately, and also protects her right "`to share future contingent benefits.'" Ibid. (quoting Moore, supra, 114 N.J. at 151, 553 A.2d 20).
In the case of disability pensions, such as the one at issue here, we have held that the portion that serves to compensate the pensioner-spouse for his disability and economic loss should not be subject to equitable distribution. Avallone, supra, 275 N.J.Super. at 584, 646 A.2d 1121. In *861 Avallone, the parties divorced before the defendant retired as permanently disabled from the Port Authority. Id. at 577, 646 A.2d 1121. Because the defendant had neither served long enough, nor reached the required age for a regular pension, he received a disability pension from the New York State and Local Police and Fire Retirement System. Ibid.
The trial court in Avallone initially ordered that the plaintiff receive half of the defendant's monthly pension benefit, but then lowered her share of the benefit slightly. Id. at 579, 646 A.2d 1121.
The trial court concluded that if defendant had retired after twenty years of service, he would have received a pension equal to one-half his final average salary and that plaintiff would have been entitled to fifty percent of this income. The trial court further concluded that since defendant's final average salary at the time he went on disability was $45,906.24, plaintiff should receive one-half of fifty percent of that figure, or $956.38 per month.
[Ibid.]
The pensioner-spouse appealed, arguing that his disability pension was analogous to an award for personal injuries, or a worker's compensation award, which are both immune from equitable distribution. Ibid.
We held that the non-pensioner spouse "should not be deprived of her right to participate in such a significant asset merely because it has been characterized as a disability pension rather than a retirement pension." Id. at 583, 646 A.2d 1121. The non-pensioner spouse is, however, only entitled to share the "portion of defendant's disability pension which represents a retirement component," but not the "portion which represents compensation for defendant's personal disability and personal economic loss." Id. at 584, 646 A.2d 1121. We then remanded for the trial court to make further findings consistent with our opinion. Ibid.
Courts in several other states have applied a similar approach as in Avallone. See Gragg v. Gragg, 12 S.W.3d 412, 417 (Tenn.2000) (holding that, where the facts warrant, "courts utilizing the analytical approach will separate the benefits into a retirement component and a true disability component, with the retirement component being classified as marital property and the disability component being classified as separate property"); Fox v. Fox, 592 N.W.2d 541, 545 (N.D.1999) ("[D]isability payments do not constitute marital property, because they are intended as replacement for income the disabled spouse would be earning currently and would be able to earn in the future had the spouse not become disabled."); Sherman v. Sherman, 740 S.W.2d 203, 207 (Mo.Ct.App.1987) (holding that pensioner-spouse's disability benefits are not marital property because they are a substitute for the husband's lost earnings occasioned by his inability to work).
Based on the testimony from the representative from the Department of Treasury, Division of Benefits and Pension, we are satisfied that defendant's benefits are intended in part "to substitute" for lost wages, and his inability to continue working as a police officer. The fact that defendant's retirement benefit is paid in the same fashion as the other retirement plans is of no moment, because his ability to receive such payments is expressly conditioned upon being disabled. Further, because defendant will only receive his pension as long as he continues to earn a lower salary than he earned as a police officer, it seems that his pension serves, at least in part, to replace the salary that he is now unable to earn as a police officer.
*862 We recognize that the statute governing the pension plan does not set forth a procedure for determining what portion of a pensioner's benefit is intended to compensate exclusively for his disability. This omission, however, cannot result in unjustly and improperly subjecting the full amount of a disability pension to equitable distribution upon divorce. Confronted with this situation, the trial court should explore, with the assistance of expert analysis, other options, including limiting the amount subject to equitable distribution to defendant's contributions to his pension, which is what he would have received had he left the police department at the time.
We do not foreclose, of course, other options which the parties may present. The goal is to balance the non-pensioner spouse's legitimate claims to a marital asset, without attaching funds intended to compensate the pensioner-spouse for his or her disabilities.[4] We also encourage the PFRS Board of Trustees to consider expressly identifying which portion of a disability pension is intended to be exclusively compensatory. Absent such a clear statement, the Board should consider promulgating guidelines to assist pensioners, their spouses, and the courts as they grapple with the complexities of these issues in the context of marital dissolution.

V
We turn next to the trial court's order requiring defendant to maintain life insurance in the amount of $275,000 to protect plaintiff's equitably acquired share of the pension benefits in the event of defendant's death. We begin our analysis of this issue by noting that "[a] deferred distribution . . . amounts to a contingency distribution dependent upon the survival of the pensioner spouse." Claffey, supra, 360 N.J.Super. at 261, 822 A.2d 630. Accordingly, if the pension does not provide survivor benefits to an ex-spouse, then her benefits cease when defendant dies. Ibid. As this court stated, "when he gets, she gets; when he dies, so does her benefit." Ibid.
Here, defendant's pension plan does not provide for survivor benefits to an ex-spouse. Therefore, if defendant predeceases plaintiff, she will no longer receive her share of his pension benefit. In this light, there is no legal support for the trial court's order directing otherwise.

VI
Finally, we address the question of child support. Defendant argues that the trial court erred by not imputing income to plaintiff when calculating his child support obligation. Specifically, he argues that the trial court failed to consider plaintiff's potential earning capacity and employment history, and he contends that plaintiff's status as the primary caretaker of the children should not be considered when determining imputation of income. Finally, defendant argues that the trial court failed to consider that the children are now school age, thus permitting plaintiff to reenter the employment market place. Plaintiff takes issue with each of defendant's arguments.
When establishing child support, a trial court should apply the Child Support Guidelines, Pressler, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at 2217 (2007). The trial court may only modify or disregard the guidelines if good cause is established for doing so. R. 5:6A. An important aspect of establishing appropriate child support is determining the *863 parent's net income. Child Support Guidelines, Pressler, Current N.J. Court Rules, Appendix IX-A to R. 5:6A at 2226 (2007).
The Supreme Court has held that "when a parent, without just cause, is voluntarily unemployed or underemployed, income may be imputed to that parent to provide for the child's needs." Caplan v. Caplan, 182 N.J. 250, 268, 864 A.2d 1108 (2005). To determine whether it should impute income to an unemployed or underemployed parent, the trial court should consider:
(1) what the employment status and earning capacity of that parent would have been if the family had remained intact or would have formed, (2) the reason and intent for the voluntary underemployment or unemployment, (3) the availability of other assets that may be used to pay support, and (4) the ages of any children in the parent's household and child-care alternatives.
[Child Support Guidelines, Pressler, Current N.J. Court Rules, Appendix 1X-A to R. 5:6A at 2227.]
The guidelines further specify that "[t]he determination of imputed income shall not be based on the gender or custodial position of the parent." Ibid. In addition, "[w]hen imputing income to a parent who is caring for young children, the parent's income share of child-care costs necessary to allow that person to work outside the home shall be deducted from the imputed income." Ibid. After determining the income of each parent, the trial court must use the guidelines worksheet to calculate the exact amount of the child support order. Id. at 2280.
Here, the trial court imputed no income to plaintiff, other than the portion of defendant's pension that it ordered she receive. The court found that plaintiff occasionally worked part-time during the marriage, but has remained unemployed since the birth of the children so that she could serve as a full-time caretaker. In this light, the court determined that plaintiff could not be expected to return to work until "her caretaking responsibilities for the children subside."
Although no evidence was adduced at trial regarding plaintiff's employment history, the parties stipulated that, "[t]he Plaintiff is currently unemployed. The Plaintiff worked only part-time during the marriage."[5] Despite the absence of direct competent evidence with respect to plaintiff's employment history, the trial court should have considered that the older child was seven years old at the time of trial, and presumably attending school. The youngest child attended pre-school. Despite this evidence, the trial court did not attempt to determine whether plaintiff was capable of assuming some employment responsibility during the time the children were at school.
Plaintiff acknowledged in her proposed findings of fact and conclusions of law that "[a]t most, she will have the ability to become employed part time, given her caretaking responsibilities for the children." Plaintiff is, of course, free to remain unemployed, but "[t]he fact that no court will actually order [plaintiff] to go to work does not mean that it cannot impute income to her." Bencivenga v. Bencivenga, 254 N.J.Super. 328, 331, 603 A.2d 531 (App.Div.1992). Given this record, we are compelled to remand the issue of plaintiff's *864 earning capacity for the trial court to determine whether income should be imputed to her.

VII

Conclusion
The sections of the trial court's final judgment of divorce: (1) subjecting defendant's police disability pension to equitable distribution; (2) directing defendant to maintain life insurance in the amount of $275,000; and (3) setting the amount of defendant's child support obligation, are vacated. The matter is remanded for further proceedings consistent with this opinion.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] Judge Cuff did not participate in oral argument. However, with the consent of counsel she has joined in this opinion. R. 2:13-2(b).
[2] At the time of trial, an outstanding pension loan of $9,000 was being deducted from defendant's monthly benefit, at a rate of $542 per month.
[3] Garrison specifically noted that this valuation did not take into account the outstanding pension loan.
[4] On remand, the trial court should also make specific findings as to whether pension loans should be considered as subject to equitable distribution.
[5] In defendant's proposed findings of fact and conclusions of law, which he submitted to the trial court before its opinion was rendered, defendant claimed that plaintiff "has worked as a special police officer, as a liquor store clerk, and at a swimming club." Such a submission is not a substitute for competent evidence.